## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **KENDALL GARRETT MOSING and ZLOOP LA, LLC** <br> *Plaintiffs* | **CASE NO.:** _____ |
| **VERSUS** | **JUDGE** _____ |
| **ROBERT "BOB" BOSTON, ROBERT "BOB" LaBARGE, ZLOOP, LLC, AND/OR ZLOOP, INC.,** <br> *Defendants* | **MAG. JUDGE** _____ |
| | **JURY TRIAL DEMANDED** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>COMPLAINT FOR VIOLATIONS OF</u>
## <u>FEDERAL AND STATE SECURITIES LAWS</u>
## <u>AND RELATED LOUISIANA LAWS</u>

1

## TABLE OF CONTENTS

I.     PARTIES ............................................................................................... 9

II.    PERSONAL JURISDICTION ............................................................. 11

III.   SUBJECT MATTER JURISDICTION AND VENUE ....................... 12

IV.    FACTS COMMON TO ALL COUNTS ............................................. 13
       A. Zloop's Business is focused on e-waste recycling........................... 13
       B. Boston and Labarge use a chance meeting with Kendall Mosing's most trusted advisor to gain access to their mark ................. 14
       C. The conspiracy begins by selling Kendall Mosing on Zloop's business opportunities in Louisiana ............................................... 14
       D. Defendants sell three Louisiana franchises in violation of Louisiana law ... 17
       E. Defendants sell unregistered LLC units in Louisiana and begin their practice of backdating documents ........................................ 19
       F. Defendants induce Kendall Mosing to make the first loan to Zloop ........... 21
       G. The first Private Placement Memorandums are circulated with promises of business expansion and growth designed to induce Kendall Mosing to make further investments in Zloop securities ................... 22
       H. A new PPM is circulated ................................................................. 26
       I. PPM counsel advise Defendants the PPM is incomplete and inaccurate..... 30
       J. Zloop uses high pressure sales tactics, promises of security interests and back dated documents to induce Kendall Mosing to purchase additional Zloop securities ....................................... 31
       K. Mosing contributes more money ................................................... 32
       L. Austin investors demand return of money due to incomplete and inaccurate PPM ............................................................................ 33
       M. The Zloop Defendants once again use Kendall Mosing's most trusted advisors to induce him to purchase additional securities, in the form of theoretical Texas franchises .............................. 35
       N. The Zloop Defendants string Kendall Mosing along with promises of a UCC1 ................................................................................... 35
       O. Agents of Zloop advise Kendall that he should accept warrants rather than the equity he bargained for ......................................... 36
       P. Mosing wires more money based on Zloop's continuing promises to provide him a UCC1 ................................................................ 38
       Q. Defendants email more misrepresentations into Lafayette, Louisiana to trick Kendall Mosing into giving Zloop an additional $5 million ............... 39
       R. ZLOOP DEFENDANTS email Kendall Mosing a UCC1 financing statement allegedly filed in North Carolina; said statement proves less than authentic ............................................................ 40
       S. ZLOOP DEFENDANTS push Kendall Mosing to purchase Texas franchise securities on the basis of imminent funds being raised by New York investment firm and promises to be quickly repaid ............................ 41
       T. Loeb Partners Corporation is retained to raise the funds Defendants promised to buy Kendall's Texas franchises and pay off other advances ... 43
       U. Warrants, warrants and more warrants......................................... 44

2

|  | | |
|---|---|---|
| | **V. Zloop needs to raise the line of credit and converts to a corporation** | 45 |
| | **W. Franchise buy-back offer** | 45 |
| | **X. Zloop again turns to Kendall Mosing's most trusted advisers to convince him to increase the line of credit by an additional $9 million** | 49 |
| | **Y. Zloop, LLC is the bank's problem, not ours** | 50 |
| | **Z. Mosing discovers the fraudulent scheme** | 51 |
| **V.** | **FEDERAL SECURITIES** | 52 |
| | **COUNT 1(a)—FEDERAL VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT of 1934 AND SEC RULE 10b-5** | 52 |
| | **COUNT 1(b)—FEDERAL VIOLATIONS OF SECTIONS 5 AND 12(a)(1) OF THE SECURITIES ACT of 1933** | 68 |
| | **COUNT 1(c)—VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT OF 1933 AGAINST DEFENDANTS BOSTON AND LABARGE** | 70 |
| | **COUNT 1(d) —VIOLATIONS OF SECTION 20 OF THE SECURITIES EXCHANGE ACT OF 1934 AGAINST DEFENDANTS BOSTON AND LABARGE** | 71 |
| **VI.** | **COUNT 2—VIOLATION OF LOUISIANA BLUE SKY LAWS: La. R.S. § 51:701 *et seq.*** | 72 |
| **VII.** | **COUNT 3—VIOLATION OF LOUISIANA BUSINESS OPPORTUNITY LAW: La. R.S. § 51:1821 *et seq.*** | 78 |
| **VIII.** | **COUNT 4—VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICE LAW: La. R.S. § 51:1401** | 81 |
| **IX.** | **COUNT 5—FRAUD: ARTICLE 1953 OF THE LOUISIANA CIVIL CODE** | 90 |
| **X.** | **COUNT 6—CONVERSION: ARTICLE 2315 OF THE LOUISIANA CIVIL CODE** | 96 |
| **XI.** | **COUNT 7—BREACH OF CONTRACT: ARTICLE 1994 OF THE LOUISIANA CIVIL CODE** | 98 |
| **XII.** | **COUNT 8— DETRIMENTAL RELIANCE: ARTICLE 1967 OF THE LOUISIANA CIVIL CODE** | 99 |
| **XIII.** | **COUNT 9—NEGLIGENT MISREPRESENTATION: ARTICLES 2315 AND 2316 OF THE LOUISIANA CIVIL CODE** | 100 |
| **XIV.** | **RESPONDEAT SUPERIOR** | 103 |
| **XV.** | **ACTUAL DAMAGES** | 103 |
| **XVI.** | **TREBLE DAMAGES** | 103 |
| **XVII.** | **JURY DEMAND** | 103 |
| **XVIII.** | **RELIEF REQUESTED** | 104 |

## Exhibit Index

| | | |
|---|---|---|
| Exhibit 1 | September 23, 2012 BOSTON email to Jim Janes enclosing a prospectus for a Zloop franchise opportunity in Ohio................................................... | 12 |
| Exhibit 2 | September 27, 2012 LABARGE email to Jim Janes enclosing a list of items included in a Zloop franchise fee ........................................................ | 13 |
| Exhibit 3 | October 2, 2012 LABARGE email to Jim Janes forwarding a prospectus for a Zloop franchise in Louisiana .............................................................. | 13 |
| Exhibit 4 | October 4, 2012 ATTACHMENT C RECEIPT ......................................... | 13 |
| Exhibit 5 | October 5, 2012 BOSTON email to Jim Janes enclosing promotional/investor package (prospectus, revenue projections and ROI simplified analysis ................................................................................... | 15 |
| Exhibit 6 | Membership certificate dated October 15, 2012........................................ | 17 |
| Exhibit 6.1 | Investor questionnaire, acceptance of subscription, acceptance of subscription documents ............................................................................. | 18, 19 |
| Exhibit 7 | December 1, 2012 LABARGE email to Jim Janes enclosing a "white paper" regarding e-waste recycling ......................................................... | 18 |
| Exhibit 8 | Membership certificate dated December 15, 2012 ..................................... | 19 |
| Exhibit 9 | December 17, 2012 BOSTON email to Jim Janes enclosing signature page | 19 |
| Exhibit 10 | January 25, 2013 BOSTON email to Jim Janes enclosing a redlined version of the Zloop, LLC Private Placement Memorandum for his review and comment.......................................................................................... | 20 |
| Exhibit 11 | March 1, 2013 BOSTON email to Jim Janes ............................................. | 20 |
| Exhibit 12 | March 7, 2013 BOSTON email to Jim Janes ............................................. | 21 |
| Exhibit 13 | SEC July 17, 2014 letter .......................................................................... | 24 |
| Exhibit 14 | March 18, 2013 BOSTON email to Kendall Mosing .................................. | 24 |
| Exhibit 15 | March 27, 2013 Jim Janes email to Jim Quinn........................................... | 24 |
| Exhibit 16 | May 9, 2013 BOSTON email to Jim Janes ................................................. | 28 |

| | | |
|---|---|---|
| Exhibit 16.1 | June 10, 2013 McGuireWoods letter ................................................. | 28 |
| Exhibit 17 | On July 12, 2013 BOSTON email to Jim Janes ................................. | 29 |
| Exhibit 18 | July 15, 2013 BOSTON email to Jim Janes ...................................... | 29 |
| Exhibit 19 | July 26, 2013 BOSTON email to Jim Janes forwarding the latest draft of the Zloop, LLC Operating Agreement ........................................ | 29 |
| Exhibit 20 | August 14, 2013 Zloop promissory note ........................................... | 31 |
| Exhibit 20.1 | August 19, 2013 BOSTON email to Kendal Mosing and Jim Janes ............ | 31 |
| Exhibit 21 | August 28, 2013 BOSTON email to Jim Janes forwarding Parker Poe law email ............................................................................. | 32 |
| Exhibit 22 | August 29, 2013 BOSTON email to Jim Janes forwarding Parker Poe email ............................................................................. | 32 |
| Exhibit 23 | September 13, 2013 LABARGE email to Jim Janes forwarding Parker Poe email ............................................................................. | 32 |
| Exhibit 24 | September 17 and 19, 2013 BOSTON emails ..................................... | 32 |
| Exhibit 25 | September 23, 2013 BOSTON letter to Jim Janes ............................... | 33 |
| Exhibit 26 | September 23, 2013 BOSTON letter to Kendall Mosing .......................... | 33 |
| Exhibit 27 | September 25, 2013 BOSTON email to Jim Janes ............................... | 33 |
| Exhibit 28 | September 30, 2013 BOSTON email to Jim Janes ............................... | 34 |
| Exhibit 29 | October 2, 2013 LABARGE email to Jim Janes, Marian Janes, Kendall Mosing and Sean Leblanc forwarding draft membership certificates for Zloop, LLC ........................................................................ | 35 |
| Exhibit 30 | October 3, 2013 BOSTON email to Jim Janes forwarding Parker Poe email ............................................................................. | 35 |
| Exhibit 31 | October 4, 2013 LABARGE email to Jim Janes ................................. | 36 |
| Exhibit 31.1 | October 4, 2013 Schafran email to Jim Janes ................................... | 36 |
| Exhibit 32 | October 9, 2013 LABARGE email to Sean Leblanc and Marian and Jim Janes ........................................................................... | 36 |

Exhibit 33     December 4, 2013 BOSTON email to Jim Janes ......................................... 38

Exhibit 34     December 5, 2013 LABARGE email to Jim Janes with "UCC1" in the subject line and forwarding a document entitled UCC FINANCING STATEMENT with a stamp showing that it was filed with the North Carolina Secretary of State, Elaine F. Marshall, on December 3, 2013 at 9:00 AM ................................................................................................. 39

Exhibit 35     January 2, 2014 Kendall Mosing letter to BOSTON ................................... 40

Exhibit 36     February 7, 2014 Jim Janes email to BOSTON ........................................... 42

Exhibit 37     March 19, 2014 LABARGE email to Jim Janes............................................ 42

Exhibit 38     March 21, 2014 BOSTON email to Jim Janes ............................................. 43

Exhibit 39     April 22, 2014 BOSTON email to Jim Janes forwarding an email discussion between BOSTON and Loeb........................................................ 47

Exhibit 40     April 22, 2014 BOSTON email to Kendall Mosing, Jim Janes and Marion Janes forwarding an email from Parker Poe................................................. 47

Exhibit 41     May 12, 2014 LABARGE email to Jim Janes forwarding a May 9, 2014 email communication from Parker Poe................................................... 48

Exhibit 42     May 29, 2014 BOSTON email to Jim Janes ................................................. 49

Exhibit 43     June 23, 2014 Kendall Mosing/BOSTON email ......................................... 49

Exhibit 44     June 23, 2014 email from BOSTON to Jim Janes ....................................... 49

Exhibit 45     Form D, along with SEC Instructions......................................................... 52

This is an action by Zloop LA, LLC and its sole owner, Kendall G. Mosing (jointly "MOSING") against Zloop, LLC and its successor, Zloop, Inc. (jointly "ZLOOP"), Robert Boston (BOSTON) and Robert LaBarge (LABARGE) for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a *et seq*.; SEC Rule 10b-5, 17 C.F.R. § 240.10b–5; Sections 11, 77d and 77l of the Securities Act of 1933, 15 U.S.C.A. § 77a *et seq*.; SEC Regulation D, 17 C.F.R. § 230.500 *et seq*.; the Louisiana Securities Law, La. R.S. 51:701 *et seq*.; the Louisiana Business Opportunity Law, La. R.S. 51:1821 *et seq*.; the Louisiana Unfair Trade Practice Act, La. R.S. 51:1401; fraud; conversion; breach of contract; negligent misrepresentation and detrimental reliance.

## I.  PARTIES

1.      Zloop LA, LLC is a Louisiana limited liability company in good standing with the Louisiana Secretary of State with its principal place of business in Lafayette, Louisiana that is authorized to do business in Louisiana.

2.      Kendall Garrett Mosing is a major citizen of the state of Louisiana, residing in Lafayette, Louisiana and the sole owner of Zloop LA, LLC.  Kendall Mosing and/or Zloop LA, LLC purchased three Louisiana and eight Texas franchises from ZLOOP, made substantial equity investments in Zloop, LLC and/or Zloop, Inc. and loaned substantial funds to Zloop, LLC and/or Zloop, Inc. in an effort to protect earlier investments.  The net funds transferred from Kendall Mosing to or on behalf of Zloop, LLC and/or Zloop, Inc. totals $26,489,179.00.  An additional amount of $700,000.00 is owed by Zloop, LLC and/or Zloop, Inc. as interest pursuant to loans made by Kendall Mosing.  Zloop, LLC claims that Kendall Mosing owes Zloop, LLC $800,000.00.  Thus, the total amount in controversy is $27,989,179.00.

3.    Zloop, LLC was a Delaware limited liability company with its principal place of business in North Carolina, which was doing business in Louisiana without authorization. Zloop, LLC converted into Zloop, Inc. on March 26, 2014.  Pursuant to La. R.S. § 12:314(A), the failure of Zloop, LLC to secure authorization to transact business in Louisiana estops it from claiming any claims made herein against it are barred by any provision of Louisiana law governing the time within which claims may be brought.

4.    ZLOOP is a Delaware corporation with its principal place of business in North Carolina and doing business in Louisiana without authorization.  Pursuant to La. R.S. § 12:314(A), the failure of Zloop, Inc. to secure authorization to transact business in Louisiana estops it from claiming any claims made herein against it are barred by any provision of Louisiana law governing the time within which claims may be brought.

5.    LABARGE is a major citizen of the state of South Carolina and who resides in Catawba County, North Carolina and can be served at 964 18th Avenue Cir NW, Hickory, NC 28601-1200.  LABARGE is a co-founder and promoter of ZLOOP.  Alternatively, he can be served at the ZLOOP offices at 816 13th Street NE, Hickory, NC 28601.  At all relevant times he was an officer and director of ZLOOP, controlled 50% of the voting units/stock of ZLOOP and was doing business in Louisiana.  He also conducts business in Louisiana with Kendall Mosing regarding Petroleum Automated Tank Cleaning Solutions, LLC (PATCS), based in Lafayette, Louisiana.  He also conducts business in Louisiana with Kendall Mosing regarding ICS GoM, LLC, based in Lafayette, Louisiana.  PATCS and ICS GoM, LLC are environmental services companies providing solutions to the petroleum exploration, drilling and recovery industry.

6.    BOSTON is a major citizen of the state of Maryland who resides in Sparks Glenco, Maryland and can be served at 15314 Priceville Road, Apartment 2, Sparks Glencoe,

Maryland 21152-9122.  BOSTON is a co-founder and promoter of ZLOOP.  Alternatively, he can be served at the ZLOOP offices at 816 13th Street NE, Hickory, NC 28601.  At all relevant times he was an officer and director of ZLOOP, controlled 50% of the voting units/stock of ZLOOP and was doing business in Louisiana.  He also conducts business in Louisiana with Kendall Mosing regarding Petroleum Automated Tank Cleaning Solutions, LLC (PATCS), based in Lafayette, Louisiana.  He also conducts business in Louisiana with Kendall Mosing regarding ICS GoM, LLC, based in Lafayette, Louisiana.  PATCS and ICS GoM, LLC are environmental services companies providing solutions to the petroleum exploration, drilling and recovery industry.

7.     Zloop, LLC, Zloop, Inc., LABARGE and BOSTON are collectively referred to herein as the "ZLOOP DEFENDANTS."

## II.     PERSONAL JURISDICTION

8.     This Court has personal jurisdiction over the non-resident ZLOOP DEFENDANTS under the Louisiana long-arm statute.  The ZLOOP DEFENDANTS have conducted continuous and systematic business in the State of Louisiana for many years and are therefore subject to general jurisdiction.  Furthermore, as described herein, the ZLOOP DEFENDANTS have engaged in specific jurisdiction contacts with the State of Louisiana, specifically with Plaintiffs who live and work in Lafayette, Louisiana, contacts giving rise to MOSING's causes of action.  The ZLOOP DEFENDANTS have done business and committed torts, in part, in Louisiana.  The ZLOOP DEFENDANTS also consented to the jurisdiction of this Court in the multi-million dollar promissory notes sued on herein.  Furthermore, this Court has personal jurisdiction over the ZLOOP DEFENDANTS pursuant to Rule 4(k)(l)(C) of the Federal Rules of Civil Procedure, and Section 27(a) of the Exchange Act, 15 U.S.C. §78(a)

because the ZLOOP DEFENDANTS transact business in Lafayette, Louisiana. The federal securities laws[1] provide for nationwide service of process such that personal jurisdiction will attach in any federal district. Moreover, where the Securities Act or Securities Exchange Act confers nationwide service of process, the question is whether the person has sufficient contacts with the United States, not any particular state, and the ZLOOP DEFENDANTS clearly have sufficient contacts with the United States.

### III.     SUBJECT MATTER JURISDICTION AND VENUE

9.     Federal jurisdiction is predicated on 28 U.S.C. §1332 because the amount in controversy in this matter exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states. Federal jurisdiction is further predicated on 28 U.S.C. §1331 because this action arises under the laws of the United States. Federal jurisdiction is also based on Section 27 (a) of the Exchange Act (15 U.S.C. 78(a)), which provides that federal district courts have exclusive jurisdiction of violations of the 1934 Act and regulations thereunder, including but not limited to Rule 10b-5. 28 U.S.C. § 1337 regarding commerce regulation also provides grounds for federal jurisdiction. Supplemental jurisdiction also exists over all Louisiana state law claims asserted as they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is predicated on 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Also, Section 27(a) of the Securities Exchange Act provides for venue and states in part: "[a]ny suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business…" Venue is also

---

[1] Securities Act, 15 U.S.C.A. § 77aa; Securities Exchange Act, 15 U.S.C.A. § 78aa.

proper under Section 27 of the Securities Exchange Act "in the district wherein any act or transaction constituting the violation occurred." The ZLOOP DEFENDANTS transacted extensive business in Lafayette, Louisiana, as is detailed in the following paragraphs, including but not limited to sending misleading and/or fraudulent statements and information into Louisiana, making misleading, false or fraudulent statements in person or over the phone in Louisiana, entering contracts with Louisiana residents, including but not limited to multi-million dollar promissory notes containing forum selection clauses requiring disputes be litigated in Lafayette, Louisiana and Louisiana franchise agreements where the ZLOOP DEFENDANTS were franchisor. As detailed herein, numerous acts or transactions constituting violations occurred in Lafayette, Louisiana, including but not limited to the dissemination of false and/or misleading marketing materials and UCC1 financing statements and utilization of unlicensed securities dealers living in Lafayette, Louisiana.

11. Also, venue is predicated on Section 22(a) of the Securities Act, making venue proper where the defendant transacts business, or where the offer or sale took place. The ZLOOP DEFENDANTS transact extensive business in Lafayette, Louisiana and the offers or sales at issue took place in Lafayette, Louisiana.

## IV.  FACTS COMMON TO ALL COUNTS

**A.  Zloop's business is focused on e-waste recycling.**

12. ZLOOP is in the business of recycling electronic waste for a profit. Broken or obsolete electronic equipment like computers, television sets, radios, cell phones, etc. are collected by ZLOOP for free because people want to discard this waste in an environmentally friendly manner. ZLOOP then crushes and processes the waste to produce copper, plastic and other byproducts that can be sold on the commodities market. Franchisees collect e-waste to be

processed at the Zloop regional supercenter assigned to their franchise locations. The revenue from this supercenter processing would be divided, 60% to the franchisee and 40% to the franchisor.

**B.    Boston and Labarge use a chance meeting with Kendall Mosing's most trusted advisor to gain access to their mark.**

13.    LABARGE met a close friend and trusted advisor of Kendall Mosing, Jim Janes, in South Louisiana at Port Fourchon in August of 2011.  In the following months LABARGE and BOSTON worked closely with Jim Janes on a tank cleaning project in Louisiana through April of 2012.  As a result of that relationship, Jim Janes eventually introduced Kendall Mosing to LABARGE and BOSTON.  Kendall Mosing perceived Jim Janes as a father figure and often sought and listened to Jim Janes' advice for many years before the events described herein.  Jim Janes and Kendall Mosing work together in Lafayette, Louisiana, own companies together and socialize together.  LABARGE and BOSTON knew that they could influence Kendall Mosing through Jim Janes.

**C.    The conspiracy begins by selling Kendall Mosing on Zloop's business opportunities in Louisiana.**

14.    ZLOOP, LLC was formed on July 20, 2012 in Delaware at the direction of LABARGE and BOSTON.

15.    On September 23, 2012, BOSTON emailed to Jim Janes in Lafayette, Louisiana a prospectus for a Zloop franchise opportunity in Ohio.  A copy of the email and prospectus is attached as **Exhibit 1**.  Nothing was stated therein about any forum selection clause controlling the location of litigation between the parties.

16.    On September 27, 2012, LABARGE emailed to Jim Janes in Lafayette, Louisiana a list of items included in a Zloop franchise fee.  A copy of the email and attachment is attached

as **Exhibit 2**.  Nothing was stated therein about any forum selection clause controlling the location of litigation between the parties.

17.     On September 28, 2012, LABARGE emailed Jim Janes in Lafayette, Louisiana and mentioned possibly locating a supercenter in Opelousas.  Nothing was stated therein about any forum selection clause controlling the location of litigation between the parties.

18.     On October 2, 2012, LABARGE emailed Jim Janes in Lafayette, Louisiana and forwarded a prospectus for a Zloop franchise in Louisiana.  A copy of the email and attachment is attached as **Exhibit 3**.  The Louisiana prospectus contained potential revenue projections that are unbacked and arbitrary.  The Louisiana prospectus did not contain the disclosure required by La. R.S. § 51:1823(2).  Nothing was stated therein about any forum selection clause controlling the location of litigation between the parties.

19.     At no time in 2012, 2013 or to the date of this filing in 2014 have the ZLOOP DEFENDANTS maintained the surety bonds required of business opportunity sellers by La. R.S. § 51:1822.  At no time in 2012, 2013 or to the date of this filing in 2014 have the ZLOOP DEFENDANTS appointed the Louisiana Secretary of State as its agent for service of process as required of business opportunity sellers by La. R.S. § 51:1823(8).

20.     On or about October 4, 2012, Kendall Mosing was asked to and did execute three documents entitled "ATTACHMENT C RECEIPT" in which Kendall Mosing purports to receive certain disclosure documents from Zloop, LLC.  A copy of the ATTACHMENT C RECEIPT is attached as **Exhibit 4**. The documents state ZLOOP "must provide this disclosure document to you 14 calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale."  The receipt said nothing about Kendall Mosing waiving rights to sue in Louisiana.

21.     Among the disclosure documents provided to Kendall Mosing on or about October 4, 2012 was a document entitled FRANCHISE DISCLOSURE DOCUMENT that included six exhibits (A to F) and three attachments (A to C).  Among other things it stated: "[t]he total investment necessary to begin operation of a ZLOOP recycling business is from $423,970 to $2,218,750.  This includes $340,980 to $2,000,000 for each ZLOOP recycling business that must be paid to the franchisor."  Attachment A was the table of contents for the "ZLOOP MANUAL" and referenced a detailed operations manual over 426 pages long.  The ZLOOP MANUAL would necessarily be part of the basis for any financial projections made by the ZLOOP DEFENDANTS, and is critical to any franchisee's ability to operate.  Moreover, any ZLOOP franchisee was contractually obligated to operate pursuant to this manual.  Despite repeated requests for same, the ZLOOP DEFENDANTS have never provided Kendall Mosing with a copy of the ZLOOP MANUAL.  The disclosure documents also stated: (1) part of the franchise fee covered the purchase of equipment necessary to operate the franchise; (2) the franchisee would have to be trained by the franchisor to operate; and (3) the franchisee would have to pay franchisor well in excess of $300 for sales plan or marketing program.  The vast majority of marketing expenses expended by ZLOOP related to a professional car racing team for which BOSTON'S son drove.

22.     The FRANCHISE DISCLOSURE DOCUMENT included the following statements:

> As of the date of this franchise disclosure document, we do not have any franchised ZLOOP Recycling Centers in operation.  Our affiliate, EZ Computer Recycling Centers, LLC operates one franchised Zloop Recycling Center, which is similar to the ZLOOP Recycling Centers operated under franchise agreements offered by this disclosure document….

Our affiliate, EZ Computer Recycling Centers, LLC, will operate the recycling and reprocessing centers that receive materials for recycling and processing from you and other ZLOOP franchisees….

The ZLOOP Recycling Centers are characterized by a unique system which we developed to obtain, handle and inventory materials to be recycled and which may include exterior and interior functions and operating requirements, a training program using special course instruction, and manuals; and unique presentations, marketing and promotional programs and materials….

Upon activation of the Marketing Development Fund (the "Fund") all franchisees must contribute an amount equal to 1% of revenues of their respective franchised ZLOOP Recycling Centers to the Marketing Development Fund (the "Fund") for advertising and promotional purposes….

23.    On October 5, 2012, BOSTON emailed Jim Janes in Lafayette, LA three promotional documents: ZLOOP's investor overview, ZLOOP's 5-year projections and ZLOOP's equipment calendar.  A copy of the email and attachment is attached as **Exhibit 5**. The email from BOSTON and the 5-year financial projections attachment contained unbacked and arbitrary financial representations regarding business income of ZLOOP and its franchisees. The email and 5-year projection attachment did not contain the disclosure required by La. R.S. **§** 51:1823(2).

**D.    Defendants sell three Louisiana franchises in violation of Louisiana law.**

24.    Less than 14 calendar days after October 4, 2012, on or about October 15, 2012, Kendall Mosing signed three mostly identical documents entitled "FRANCHISE AGREEMENT" with ZLOOP, LLC, LABARGE signing on behalf of ZLOOP, LLC, for the three franchises available in Louisiana.  Kendall Mosing signed the paperwork on behalf of ZLOOP LA-T1, LLC, ZLOOP LA-T2, LLC and ZLOOP LA-T3, LLC, but none of those entities existed then or were ever formed.  Neither Kendall Mosing individually nor Zloop LA, LLC executed these FRANCHISE AGREEMENTS.  Among the provisions of the FRANCHISE AGREEMENT violating Louisiana law is the provision, on page 32, stating the non-existent

franchisee waived its right to bring suit in Louisiana and instead must sue for violations of Louisiana's securities law in North Carolina, a violation of La. R.S. § 51:1823(7) and 15 U.S.C.A. § 78cc(a).  The FRANCHISE AGREEMENT, on page 8, also purports to have the franchisee waive all claims, known and unknown, against ZLOOP, LLC at the date of execution, also a violation of La. R.S. § 51:1823(7) and 15 U.S.C.A. § 78cc(a).  Both provisions are invalid and unenforceable under Louisiana and federal law even if Plaintiffs had executed them. Louisiana has a strong interest in protecting its citizens from such abusive and adhesive contractual provisions.  These acts constitute some of the many indicia of fraud demonstrated by the ZLOOP DEFENDANTS.

25.     The Louisiana FRANCHISE AGREEMENT and operations manual sought to give the franchisor substantial control over the franchisee's operation.  The documentation supplied by the ZLOOP DEFENDANTS demonstrates that the franchise was set up to where the franchisee had a minimal role in the operation of the franchise.  The franchisee was totally dependent on the franchisor's services to function.  There would be no way for the franchisee to operate without the franchisor, which is proven by the fact that the Louisiana (and later Texas) franchises purchased by Kendall Mosing never operated in light of the fact that the corporate facility only began functioning four months ago.  A prospective franchisee like Kendall Mosing was totally dependent on the franchisor to open and operate the corporate facility, utilizing highly specialized machinery from overseas, to be able to make a profit from recycling ewaste. In this instance the Louisiana franchises were sold in October of 2012 but the corporate facility did not open until April 1, 2014.  During this time all franchisees were totally dependent on the franchisor to make a profit, but did not because the franchisor was not operational.  Included in this reliance was the franchisee's reliance that the franchisor would open and operate a Super

16

Center in Opelousas, Louisiana to make the Louisiana franchises profitable.   Also, as demonstrated herein, the ZLOOP DEFENDANTS relied heavily on the franchise fees paid by Kendall Mosing as risk capital, even seeking to bill Kendall Mosing later for services that were never rendered, before the franchisor was operational, because the franchisor simply needed money.  The fees charged for the franchise rights were far in excess of the franchisor's costs to meet its obligations under the FRANCHISE AGREEMENT.   All of these facts make the franchise contracts sold by the ZLOOP DEFENDANTS investment contracts pursuant to federal and Louisiana law.

26.   The ZLOOP DEFENDANTS sold Kendall Mosing the Texas franchises by telling him that they would be repurchased by ZLOOP shortly in conjunction with the next round of financing they were preparing.   MOSING and the ZLOOP DEFENDANTS never had any intention for Kendall Mosing to actually operate the Texas franchises sold.   The ZLOOP DEFENDANTS simply informed Kendall Mosing that he would make a handsome profit on the repurchase transaction, making this an investment contract security to which Louisiana and federal law securities law applies.

**E.      Defendants sell unregistered LLC units in Louisiana and begin their practice of backdating documents.**

27.   On October 15, 2012, ZLOOP, LLC issued Kendall Mosing a membership certificate dated October 15, 2012 that stated Kendall Mosing purchased 200,000 Class B units in ZLOOP, LLC, constituting 2% of the outstanding 12,000,000 units.  A copy of this certificate is attached as **Exhibit 6**.

28.      October 15, 2012 is also the date on a subscription agreement in which Kendall Mosing agrees to make a 1% equity investment in ZLOOP through part of a private placement memorandum prepared by ZLOOP in April of 2013.  This document was actually signed by

Kendall Mosing in August of 2013, when Kendall Mosing made an equity investment in ZLOOP, but back-dated by LABARGE to October 15, 2012 in an effort to meet federal and state disclosure requirements for earlier equity investments made by Kendall Mosing.  LABARGE signed this document on behalf of ZLOOP, LLC, agreeing to the terms and conditions of the only PPM in existence at that time, the one dated April of 2013.  The referenced signature pages are attached as **Exhibit 6.1**.

29.     October 20, 2012 is the date on another subscription agreement between ZLOOP and Kendall Mosing regarding another 1% equity investment in Zloop, LLC for Class B, non-voting shares.  The only copy of this document in Kendall Mosing's possession is the one containing his signature.  Kendall Mosing was never provided a fully executed copy of this document despite repeated requests for same.

30.     On October 29, 2012, Kendall Mosing, from his office in Lafayette, Louisiana, directed his bank to wire ZLOOP $1,000,000 for a 1% interest in ZLOOP and $1,989,179 for the three available Louisiana franchises referenced above.

31.     On November 2, 2012 Kendall Mosing caused Zloop LA, LLC to be formed.

32.     On December 1, 2012, LABARGE emailed Jim Janes in Lafayette, Louisiana a "white paper" regarding e-waste recycling.  Among other things LABARGE states "at the time we wrote that the parent company was EZ COmputer [sic] Recycling Centers, LLC and the solution was Zloop franchising.  I have made the necessary corrections so that it is all under the Zloop umbrella."  A copy of the email and attachment is attached as **Exhibit 7**.

33.     On December 3, 2012, LABARGE emailed Jim Janes in Lafayette, Louisiana a Power-point presentation designed to attract investors or franchisees.  At the end of the

presentation Jim Janes is listed as the Business Development contact for ZLOOP, making him an agent of ZLOOP.

34.     December 15, 2012 is the date on a document entitled SUBSCRIPTION AGREEMENT signed by Kendall Mosing wherein ZLOOP accepts Kendall Mosing's commitment to invest an additional $4,000,000 in ZLOOP.  These documents, the signature pages for the April 2013 PPM, were actually signed in August of 2013 and back-dated at the direction of LABARGE.  See **Exhibit 6.1**.

35.     December 15, 2012 is the date on a membership certificate issued by ZLOOP to Kendall Mosing for 200,000 Class B units, out of 12,000,000 available.  This capital structure conflicts with that stated in the ZLOOP Private Placement Memorandums dated March and April of 2013 and discussed below.  A copy of the membership certificate is attached as **Exhibit 8**.

**F.      Defendants induce Kendall Mosing to make the first loan to Zloop.**

36.     On December 17, 2012, ZLOOP executed a promissory note to Kendall Mosing in the amount of $4,000,000 on a loan amount of $3,500,000.  The promissory note was negotiated by or on behalf of Kendall Mosing in Lafayette, Louisiana, prepared in Lafayette, Louisiana, and calls for the application of Louisiana law and a Lafayette, Louisiana forum to resolve disputes.  BOSTON, LABARGE and ZLOOP, LLC consented to personal jurisdiction here in Lafayette, Louisiana.  The note was due on March 15, 2013 and remains unpaid.  A copy of the email from BOSTON to Jim Janes in Lafayette, Louisiana forwarding ZLOOP's signature page for the note is attached as **Exhibit 9**.

37.     On December 18, 2012 and January 3, 2013, Kendall Mosing, from his office in Lafayette, Louisiana, directed his bank to wire ZLOOP a total of $3,500,000, the loan proceeds related to the promissory note discussed above.

G.     **The first Private Placement Memorandums are circulated with promises of business expansion and growth designed to induce Kendall Mosing to make further investments in Zloop securities.**

38.     On January 3, 2013 LABARGE emailed Jim Janes in Lafayette, Louisiana a draft Private Placement Memorandum that had been prepared for potential investors by the Charlotte, North Carolina law firm of McGuireWoods LLP.  LABARGE'S purpose in sending this email was to facilitate Jim Janes' efforts to solicit investors for ZLOOP.

39.     January 5, 2013 is the date on a Subscription Agreement signed by Kendall Mosing in Lafayette, Louisiana in which he agrees to pay $1,000,000 for an additional 1% non-voting interest in ZLOOP.  The only copy of this document in Kendall Mosing's possession is the one signed only by him.  Despite ZLOOP accepting his money and repeated requests, Kendall Mosing has never been provided fully executed copies of this document.

40.     On January 25, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana a redlined version of the ZLOOP Private Placement Memorandum for his review and comment. This draft PPM included financial forecasts that were totally unbacked.  Moreover, this draft PPM included assumptions used in the financial projections.  The final March and April versions of the PPM excluded these assumptions, making the PPMs even more incomplete and inaccurate. Moreover, in this email BOSTON forwards communications from counsel for ZLOOP regarding edits to the PPM to a non-client, Jim Janes, resulting in waiver of any applicable privilege and confidentiality.  A copy of this email is attached as **Exhibit 10**.

41.     On February 28, 2013, LABARGE emailed BOSTON and referred to a $3,500,000 commitment being made in response to the pending Private Placement Memorandum.  On information and belief, this was a reference to the $3,500,000 loan made by Kendall Mosing as described above.  A copy of this email is attached as **Exhibit 11**.

42.    On March 7, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana forwarding an employment contract for an ex-Dell Computers employee and stating that said hire gives Zloop, LLC "an immediate evaluation [sic] of $300M."  The valuation and email contained multiple misrepresentations.  This email is attached as **Exhibit 12**.  The body of the entire email is cut and pasted below.

Jim-

I am writing this to give you an important update on the company and a very special opportunity for you to present to Kendall for the value and loyalty he has brought to this company.

Attached is Mike Watson's signed employment agreement to act and serve as Zloop's CEO for the next 4 years which instantly gave this company an immediate evaluation of $300M.

We will be circulating the PPM today and within the next 2 weeks should have at least $10M and up to $21.7M in funding.

We will immediately go for the next round of funding which will be in the range of $50-100M.

Our equipment is at the docks in Charleston and if Kendall exercises his option of 1% for $1M we will give him 1.5% for his loyalty and dedication to Zloop.

For your hard work we would also give you a half of 1% which would give you a in-the-money valuation of $1.5 M

After the PPM closes we will never be able to present an offer like this again. Essentially Kendall will be getting an in-the-money valuation of $4.5M.

This would have to happen no later then 3pm tomorrow.

On a final note, once the PPM is closed we will reimburse Kendall $4M.

Please do not show this [PPM] or talk about this [PPM] with anyone except Kendall!!!!

Bob Boston, Founder

43.   The initial round of funding referenced in BOSTON'S email above never occurred, nor did the secondary round.  This offer was also made, and required action, before the final PPM was prepared and sent to Jim Janes to offer to Kendall Mosing.  As was typical of BOSTON'S efforts to secure funding from Kendall Mosing, the window of opportunity to act was tiny and constituted high pressure sales tactics that are unfair and deceptive.

44.   On March 11, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana the "COMPLETED FINAL PPM[2]" that he and Jim Janes had been working on and talking about. This document, well over 200 pages, was forwarded to Jim Janes for the specific purpose of soliciting funds from Kendall Mosing.  None of the twelve disclosure sections of the PPM included a forum selection clause.

45.   The capital structure set forth in the PPM conflicted with earlier unit certificates and later stock certificates issued to Kendall Mosing.  Schedule A to this PPM shows LABARGE and BOSTON with 6,250,000 units each for a total of 12,500,000 A shares, and Kendall Mosing having 1,200,000 B units out of a total 13,960,000 B units, an 8.6% interest. Currently, the ZLOOP DEFENDANTS contend Kendall Mosing only owns 1% of the company. The PPM also stated that Jim Janes was on the board of directors and that ZLOOP was managed by a board of seven directors.  However, there was no board of directors for this LLC, only two managing members who had total control of same: LABARGE and BOSTON.  Jim Janes never had any authority or control over any of the ZLOOP DEFENDANTS—the ZLOOP DEFENDANTS simply called him a director to make Kendall Mosing feel like he had some degree of control over his investments.  The PPM stated that any investments would be secured by a security interest in the company's equipment, working capital and building in North Carolina.  The PPM also claimed a valuation of $80,000,000 for ZLOOP.  The PPM also stated,

---

[2] The document is entitled CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM.

in the included proposed Operating Agreement for Zloop, LLC, that if the LLC ever converted to a corporation the unit members would be issued stock in proportion to their LLC capital accounts.   The exact language states that in the event of a conversion the "members shall receive stock in the new corporation in proportion to their respective Capital Accounts…."   The operating agreement makes it clear that "non-cash property, services" provided by members "shall only be considered for the purpose of determining the number of Units and shall not entitle the contributor thereof to any credit in such contributor's initial Capital Account…."   According to Exhibit A, Schedule A, of the March 2013 PPM, total capital of ZLOOP was $5,100,000, and Kendall Mosing's capital account was $5,000,000.   The capital accounts of other cash investors only contained $100,000.   Thus, Kendall Mosing provided in excess of 98% of the capital for Zloop, Inc..   Sweat equity did not entitle BOSTON and LABARGE to stock in the new corporation.   Thus, the ZLOOP DEFENDANTS represented that upon conversion ZLOOP would be obligated to issue shares of stock to Kendall Mosing amounting to 98% of outstanding shares. The ZLOOP DEFENDANTS never did, however, execute the FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF ZLOOP, LLC like they represented they would in the PPM.

46.   The PPM states that Zloop, LLC was exempted from registration pursuant to Rule 506 of Regulation D, the private offering exemption of Section 4(2) of the Securities Act of 1933.   While companies using the Rule 506 exemption do not have to register their securities and may not have to file reports with the SEC, they must file a Form D when they first sell their securities.   Because the ZLOOP DEFENDANTS were advised by competent securities counsel in the PPM, they knew that the Form D filing was required.[3]   Despite this, the ZLOOP

---

[3] Knowledge of the attorney is imputed to the client. *Brown v Schonekas, Winsberg, Evans & McGoey*, 122 So. 3d 1176 (La. App. 4th Cir. 2013); *Lirette v. Roe*, 93-0441 (La. Ct. App. 4 Cir. 1/13/94), 631 So.2d 503; *RTA v. Levey*,

DEFENDANTS willfully failed to ever file the Form D, as demonstrated in the report from the Securities and Exchange Commission attached as **Exhibit 13**.

47.     On March 18, 2013, BOSTON emailed Kendall Mosing in Lafayette, Louisiana to state that he and LABARGE "hired Joel Katz to raise $10M[4] for us to finish the Hickory Super Center, pay you back, and buy the land for the Louisiana Super Center." BOSTON also solicited Kendall Mosing to invest more money to pay for equipment that was "sitting at the Port of Charleston" and other equipment that was "ready to ship from Germany. That was why Jim came to you with that special deal to raise the 1M to get the equipment released while the PPM was being funded." In this email BOSTON misrepresents that "Zloop will become the largest eWaste Recyclers in the world!" This email is attached as **Exhibit 14**.

48.     On March 27, 2013, Jim Janes, from his office in Lafayette, Louisiana, emailed Jim Quinn, a potential investor, pitching him on investing in ZLOOP. A copy of this email is attached as **Exhibit 15**.

**H.      A new PPM is circulated.**

49.     On April 24, 2013, ZLOOP finalized amendments to its prior PPM converting the structure of the offering to convertible debt terms. Schedule A to this PPM shows LABARGE and BOSTON with 6,250,000 units each for a total of 12,500,000 A shares, and Kendall Mosing having 1,200,000 B units out of a total 13,960,000 B units, an 8.6% interest. As of this date, ZLOOP still has not issued share certificates to Kendall Mosing showing this equity position in

---

595 So.2d 1255 (La. Ct. App. 4 Cir. 1992); *Wilco Marsh Buggies and Draglines, Inc. v. XYZ Insurance Company*, 520 So.2d 1292 (La. Ct. App. 5 Cir. 1988); *Andre v. Golden*, 99-689 (La. Ct. App. 5 Cir. 12/21/99), 750 So.2d 1101, 1104 ("Further, it is well settled that the knowledge of an attorney, actual or otherwise, is imputed to his or her client."); *Clofer v. Celotex Corp.*, 528 So. 2d 1074, 1076 (La. Ct. App. 5 Cir. 1988) ("Even if plaintiff did not understand the full implications of the doctor's findings, both Louisiana and federal jurisprudence clearly impute the knowledge of an attorney to his client."); *Gibson v. Herman, Herman, Katz & Cotler*, 2004-2204 (La. Ct. App. 4 Cir. 2/15/06), 927 So.2d 1178; *and Stevison v. Charles St. Dizier, Ltd.*, 2008-887 (La. Ct. App. 3 Cir. 3/25/09), 9 So.3d 978.
[4] This is a reference to the PPM, which was for $10,000,000.

the company.  In fact, the ZLOOP DEFENDANTS have refused to issue Kendall Mosing stock certificates for anything more than 1% of Zloop, Inc. stock.  Just like the March 2013 PPM, the April 2013 PPM also stated, in the included Operating Agreement for Zloop, LLC, that if the LLC ever converted to a corporation the unit members would be issued stock in proportion to their LLC capital accounts.   The exact language states that in the event of a conversion the "members shall receive stock in the new corporation in proportion to their respective Capital Accounts…."   The operating agreement makes it clear that "non-cash property, services" provided by members "shall only be considered for the purpose of determining the number of Units and shall not entitle the contributor thereof to any credit in such contributor's initial Capital Account…."  According to Exhibit A, Schedule A, of the March and April 2013 PPMs, total capital of Zloop, LLC was $5,100,000, and Kendall Mosing's capital account was $5,000,000.  The capital accounts of other cash investors only contained $100,000.  Thus, Kendall Mosing provided in excess of 98% of the capital for ZLOOP.  Sweat equity did not entitle BOSTON and LABARGE to stock in the new corporation.  This PPM stated that upon conversion Zloop, Inc. would be obligated to issue shares of stock to Kendall Mosing amounting to 98% of outstanding shares.  The ZLOOP DEFENDANTS never did, however, execute the FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF ZLOOP, LLC like they represented they would in the PPM, despite them later accepting Kendall Mosing's $1 and $4 million subscriptions to same.

50.    Both PPMs were incomplete and inaccurate in the following non-exhaustive ways:

a.  The financial projections were totally arbitrary and speculative;[5]

---

[5] The inaccurate and misleading forward looking statements made in the March and April 2013 PPMs, including but not limited to projections of revenue and income/loss and number of units, are not protected by the safe-harbor

b.  There was no seven-person board—LABARGE and BOSTON had total control;

c.  That ZLOOP intended to make quarterly distributions to the shareholders; no such distributions have ever been made;

d.  That ZLOOP would adopt an operating agreement other than the one attached to the PPM before corporate conversion, one that precluded LLC unit owners from being issued "stock in the new corporation in proportion to their respective Capital Account" and sought to eliminate BOSTON and LABARGE'S fiduciary duties;

e.  That ZLOOP would be fully operational in the third quarter of 2013; the first supercenter only became operational in 2014 and no progress has been made towards opening the Opelousas, Louisiana supercenter;

f.  That investors under the PPM would be granted preemptive rights to purchase a proportionate amount of future offerings; Kendall Mosing has been granted no such rights and in fact, has somehow had his ownership reduced to 1% of the current corporation according to the ZLOOP DEFENDANTS;

g.  That investors would receive certificates showing their interest in ZLOOP; to date, the ZLOOP DEFENDANTS have failed to provide Kendall Mosing certificates showing his full and actual interest in ZLOOP despite repeated requests for the same;

h.  Failing to disclose the failure to file a Form D when they first sold securities;

---

provisions of the Securities Exchange Act because they relate to a limited liability company.  Securities Exchange Act § 21E(b), 15 U.S.C.A. § 78u-5(b).

i.   That Kendall Mosing would receive a security interest in all property, plant and equipment and preemption rights in any future offerings pursuant to the April 2013 Private Placement Memorandum;

j.   The time within which the Zloop franchisor business would be operational and enable franchisees to operate and generate revenue for ZLOOP;

k.   That ZLOOP had a $80,000,000 valuation;

l.   That ZLOOP would start generating revenue before April of 2014 in amounts substantially greater than has actually occurred; and

m.  Both PPM's omitted the material fact that BOSTON and LABARGE were using ZLOOP money for their personal benefit, including lavish shopping trips to Chicago and hiring a private jet.

51.   The April 2013 PPM grants a security interest "pursuant to a security agreement covering the Company's equipment and working capital and a deed of trust covering the Company's building located at 816 13th Street, NE, Hickory, NC 28601;" to date, Kendall Mosing has not been given a security agreement or any documentation of this security interest, despite repeated requests for the same.   As discussed later, the ZLOOP DEFENDANTS fabricated a UCC1 financing statement and sent same to MOSING with an email stating the fake document had been filed with the North Carolina Secretary of State when it had not.

52.   On May 9, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana and advised that he had asked a couple franchise owners if they would make a payment or two on their outstanding bills even though the franchisor is not operational.  BOSTON asks Jim Janes if Jim thinks it is appropriate to ask Kendall Mosing to do this.  Jim Janes responded:  "I don't

think it is a good idea to approach Kendall when we are late with his payment of 4M.  We don't want to arouse doubts when he is being patient."  A copy of this email is attached as **Exhibit 16**.

**I.       PPM counsel advises Defendants the PPM is incomplete and inaccurate.**

53.      On June 10, 2013, ZLOOP's attorneys at McGuire Woods emailed the ZLOOP DEFENDANTS and stated that Zloop's PPM (the latest one at that time being April of 2013) must be revised due to it being incomplete and inaccurate and that current subscribers must be offered the opportunity to withdraw their subscriptions and get their money back.  On June 19, 2013, McGuireWoods sent a second letter renewing its earlier recommendation regarding the incomplete and inaccurate PPM and stated that it would withdraw as counsel in five days if the recommendations were not implemented.  Rather than implement the recommendations of its counsel, the ZLOOP DEFENDANTS fired McGuireWoods and retained new counsel, the law firm of Parker Poe Adams & Bernstein, LLP.  Copies of the letters from and to McGuireWoods, attached as **Exhibit 16.1**, were forwarded to Jim Janes, a non-client, by BOSTON, waiving any privilege and confidentiality associated with same.

54.      ZLOOP never offered subscribers to the PPM, including but not limited to Kendall Mosing, to withdraw from the incomplete and inaccurate PPM and have his money returned.  Instead, they kept his money and took even more: on June 11, 2013, Kendall Mosing faxed, from his office in Lafayette, Louisiana, wiring instructions to his bank to wire Zloop, LLC $1,000,000 for an option on the available franchise territories in Texas.  No written agreement was entered regarding this option at this time.

**J.** **Zloop uses high pressure sales tactics, promises of security interests and back dated documents to induce Kendall Mosing to purchase additional Zloop securities.**

55.     On July 12, 2013, BOSTON emailed Jim Janes saying the ZLOOP DEFENDANTS were completely out of money and that they were closing down until they completed the PPM.  A copy of this email is attached as **Exhibit 17**.

56.     On July 15, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana saying "things are coming unraveled" and forwarding a demand for payment on equipment seeking payment of roughly $2,200,000.  A copy of this email and letter is attached as **Exhibit 18**.

57.     On July 26, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana forwarding the latest draft of the Zloop, LLC Operating Agreement.  BOSTON said he would not sign same unless Jim Janes and Kendall Mosing accepted its terms and conditions and that BOSTON wanted to make sure Jim Janes and Kendall Mosing were represented properly.   A copy of the email is attached as **Exhibit 19**.  This Operating Agreement purported to be effective July 20, 2012, despite review of same taking place over a year later.  Moreover, said Operating Agreement conveniently did not address the issue of conversion of LLC units to stock shares in the event of a conversion.  The Operating Agreement provided for Class A and B units.  Class A units were for founders and were voting; Class B units were for investors and were not voting.  The Operating Agreement also sought to contractually eliminate the fiduciary duties owed by LABARGE and BOSTON to MOSING in Article 5, provisions which were not contained in the earlier operating agreement contained in the March and April PPMs.  ZLOOP has never provided Kendall Mosing with a fully executed copy of this document despite multiple requests for same, estopping any defendant from asserting provisions in this document as the basis for any defense to the claims made herein by MOSING.   In this email BOSTON forwards

29

communications from counsel for ZLOOP regarding edits to the Operating Agreement to a non-client, Jim Janes, resulting in waiver of any applicable privilege and confidentiality.

58.     In or around early August 2013, Kendall Mosing and Jim Janes went to Hickory, North Carolina to meet with LABARGE and BOSTON about perfecting security for Kendall Mosing's existing investments and whether Kendall Mosing would invest additional funds to help stop an equipment foreclosure.  Once in Hickory, LABARGE convinced Kendall Mosing to sign several subscription agreements for the Private Placement Memoranda discussed above and date them October 15, 2012 and December 15, 2012, apparently to cover Kendall Mosing's earlier investments in Zloop, LLC around those dates ($4,500,000).   Consistent with the April PPM, while there, LABARGE and/or BOSTON told Kendall Mosing that if Kendall Mosing loaned them the money to stop the equipment foreclosure this loan would be covered by a security interest on all of Zloop, LLC's equipment and that they would supply the paperwork to perfect same.   Kendall Mosing reasonably relied upon this representation that was totally consistent with the April PPM.  Kendall Mosing believed LABARGE and BOSTON would live up to their written and oral promises to document and perfect Mosing's security interest.

**K.     Mosing contributes more money.**

59.     On August 14, 2013, following the sales pitch provided by LABARGE and BOSTON, Kendall Mosing wired ZLOOP another $3,000,000.  $2,000,000 was for a loan to stop foreclosure proceedings on equipment and $1,000,000 was to purchase additional units in the LLC, a 1% interest that Kendall Mosing contemplated transferring to his friend, Sean Leblanc, at a later date pursuant to an appropriate exemption.

60.     On August 14, 2013, ZLOOP executed a promissory note in the amount of $2,000,000 payable to Kendall Mosing, plus 10% interest payable by October 31, 2013.  The

promissory note was negotiated by or on behalf of Kendall Mosing in Lafayette, Louisiana, prepared in Lafayette, Louisiana, and calls for the application of Louisiana law and a Lafayette, Louisiana forum to resolve disputes.  BOSTON, LABARGE and ZLOOP, LLC consented to personal jurisdiction here in Lafayette, Louisiana.  A copy of the note is attached as **Exhibit 20**.

61.    On August 19, 2013, BOSTON emailed Kendall Mosing and Jim Janes an email from LABARGE to BOSTON wherein LABARGE represents that a CEO of a Houston company was valuing a single Texas franchise for Zloop, LLC at $5.1 million.  See **Exhibit 20.1**.  At the time Kendall Mosing had paid $1 million for an option to purchase all eight Texas franchises. As detailed below, Kendall Mosing later exercised that option and paid $9 million for franchises that the ZLOOP DEFENDANTS represented was worth over $40 million.  On information and belief, there was no purchaser willing to pay anywhere near $5.1 million for a single Texas franchise on August 19, 2013.

**L.    Austin investors demand return of money due to incomplete and inaccurate PPM.**

62.    Around this time multiple investors from Austin, Texas, who had invested through the PPMs, were making demand for a return of their investments and threatening legal action. The ZLOOP DEFENDANTS took investors' money but refused to sign the subscription agreements or return the money, similar to the scheme later used against Kendall Mosing.  On August 28, 2013, legal counsel for Zloop, LLC at the Parker Poe law firm in Charlotte, North Carolina emailed LABARGE and BOSTON a dire warning about the failure to return the investment of the Austin investors as specified in "the Company's letter to investors dated August 7, 2013."[6]  The same day BOSTON forwarded the email to Jim Janes in Lafayette, Louisiana with a request that Jim Janes call BOSTON to discuss the warning.  The transmission of this communication to a non-client waives any applicable privilege and confidentiality.  This

---

[6] Despite being the largest investor at that time Kendall Mosing did not receive a copy of this letter.

email confirmed what BOSTON and LABARGE already knew—the ZLOOP DEFENDANTS were about to be sued by investors for providing incomplete and inaccurate information in the Private Placement Memorandums, just as McGuireWoods had warned them about.  A copy of this email is attached as **Exhibit 21**.

63.     On August 29, 2013, BOSTON again waived any applicable privileges and confidentiality by forwarding another communication from ZLOOP's attorney at Parker Poe asking for a status report on returning the Austin investor's money to Jim Janes in Lafayette, Louisiana in an obvious attempt to increase the pressure on Kendall Mosing to invest more money in ZLOOP to protect his prior investments.  A copy of this email is attached as **Exhibit 22**.

64.     On September 13, 2013, LABARGE, at the direction of BOSTON, forwarded Jim Janes in Lafayette, Louisiana another communication from the Parker Poe law firm discussing the impending litigation by the Austin investors claiming ZLOOP misled investors in the PPMs and violated securities laws while structuring and marketing the PPMs.  The transmission of this communication to a non-client waives any applicable privilege and confidentiality.  A copy of the email is attached as **Exhibit 23**.

65.     On September 17 and 19, 2013, BOSTON had email communications with various parties during which he communicated a need for immediate investment to refund the Austin investor's money and that there was no time for any investigation.  Copies of these emails are attached as **Exhibit 24**, in globo.

**M.    The Zloop Defendants once again use Kendall Mosing's most trusted advisors to induce him to purchase additional securities, in the form of theoretical Texas franchises.**

66.    On September 23, 2013, all of BOSTON and LABARGE'S high-pressure selling paid off when they were one step closer to securing Kendall Mosing's agreement to pay $9,000,000 for all of the available franchises in Texas.  As payment for Marian and Jim Janes' assistance in securing these funds ZLOOP, LLC agreed to give 1% of non-voting units to Marian Janes and pay off the balance on their house.  A copy of the letter confirming this agreement is attached as **Exhibit 25**.

67.    Also on September 23, 2013, BOSTON Federal Expressed Kendall Mosing a separate letter agreement in Lafayette, Louisiana in which he confirmed that Kendall Mosing had already invested $1,000,000 for the option to buy the eight franchise territories for Texas for $10,000,000 (a discounted rate according to BOSTON).  A copy of the letter confirming this agreement is attached as **Exhibit 26**.

**N.    The Zloop Defendants string Kendall Mosing along with promises of a UCC1.**

68.    On September 25, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana regarding the equipment that Kendall's August 14, 2013 funds saved.  BOSTON stated that upon receipt of confirmation of funds being transferred, Zloop, LLC would file a UCC1 financing statement in Catawba County, North Carolina.  A copy of this email is attached as **Exhibit 27**.  Kendall Mosing continued to reasonably rely on these representations that LABARGE and/or BOSTON would live up to their written and oral promises to document and perfect Kendall Mosing's security interest.

69.    On September 30, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana a term sheet, signed by BOSTON for ZLOOP, regarding Kendall Mosing making a $3,000,000

loan to ZLOOP for the exclusive purpose of settling with the Austin investors and satisfying other current liabilities.  Jim Janes drafted the Term Sheet in Lafayette, Louisiana and Kendall Mosing executed same in Lafayette, Louisiana.  As part of the consideration for this loan ZLOOP would immediately issue 5% of Zloop B units bringing Kendall Mosing's ownership to 7%.  The $3,000,000 payment would also be applied to Kendall Mosing's purchase of the Texas franchise territories such that the balance remaining to be paid was $6,000,000.  Finally, ZLOOP would issue 1% of its non-voting units to Marian Jones to bring her ownership to 2%.  A copy of this email and term sheet is attached as **Exhibit 28**.

**O.     Agents of Zloop advise Kendall that he should accept warrants rather than the equity he bargained for.**

70.     Instead of issuing Kendall Mosing unit certificates for an additional 5% of Zloop B units, BOSTON and LABARGE had Kendall Mosing execute a Grant Agreement and Warrant with ZLOOP in which Kendall Mosing was given the right to purchase the 5% of non-voting units that he had just bought with the $3,000,000 payment discussed above.  In other words, instead of getting equity for his investment he was given the right to buy more equity, later, at the same inflated price he had just paid.  These documents are dated October 1, 2013.  On information and belief, the ZLOOP DEFENDANTS failed to disclose that the arbitrary and unrealistic valuation of ZLOOP could create a substantial tax liability if Kendall Mosing was awarded the 5% stock called for by the term sheet.  After the money had been transferred, agents of the ZLOOP DEFENDANTS advised Kendall Mosing that he would face an adverse taxable event if he accepted the stock and that the only way to avoid an adverse taxable event was to instead accept warrants.  By these actions the ZLOOP DEFENDANTS assumed the duty to act as investment advisor to Kendall Mosing.  The ZLOOP DEFENDANTS failed to make a material disclosure to Kendall Mosing to induce him to loan the company money and then have

him accept worthless warrants instead of the equity the ZLOOP DEFENDANTS promised to exchange.  Kendall Mosing signed the Grant Agreement and Warrant in Lafayette, Louisiana and forwarded the signed paperwork to Zloop, LLC.  Mosing has demanded fully executed copies of these securities repeatedly, but to this date Zloop, LLC has never provided fully executed copies. Moreover, these warrants for Class B units, and any earlier ones granted to Kendall Mosing, were rendered invalid by the corporation conversion in which no Class B shares exist.

71.    On October 2, 2013, LABARGE emailed Jim Janes, Marian Janes, Kendall Mosing and Sean Leblanc in Lafayette, Louisiana and forwarded draft membership certificates for ZLOOP.  Kendall Mosing was shown to own 1,000,000 of 12,000,000 outstanding Class B units of Zloop, LLC, constituting 8.33% of outstanding units.  The number of outstanding units conflicts with the PPM showing 13,960,000 units outstanding. A copy of the email and attached certificates is attached as **Exhibit 29**.

72.    On October 3, 2013, BOSTON forwarded Jim Janes in Lafayette, Louisiana another communication from ZLOOP's attorney at Parker Poe regarding the need to immediately resolve the Austin investor situation.  BOSTON's message to Jim Janes was that ZLOOP needed to resolve this dispute immediately or legal fees would be staggering.  With this communication BOSTON intended to increase the pressure on Kendall Mosing, through his trusted advisor Jim Janes, to invest additional funds or face the loss of his prior investment.  The transmission of this communication to a non-client waives any applicable privilege and confidentiality.   A copy of the email is attached as **Exhibit 30**.

73.    On October 4, 2013, LABARGE emailed Jim Janes in Lafayette, Louisiana to tell him that litigation would likely be filed by the Austin investors — presumably over the incomplete and inaccurate PPMs McGuireWoods warned them about — the following Monday

and asking if there was a problem with the Kendall Mosing funding.  LABARGE also forwarded communication between him and ZLOOP's attorneys, waiving any applicable privilege and confidentiality.  A copy of the email is attached as **Exhibit 31**.  Jim Janes later that day emailed that "the Bank of Louisiana" (a reference to Kendall Mosing), was in the process of securing the funds to send a $3 million wire to the ZLOOP DEFENDANTS. See **Exhibit 31.1**.

**P.**     **Mosing wires more money based on Zloop's continuing promises to provide him a UCC1.**

74.     On October 7, 2013, Kendall Mosing, from Lafayette, Louisiana, directed his bank to wire transfer $3,000,000 to Zloop, LLC as contemplated by the Term Sheet discussed above.  As additional consideration for this funding the ZLOOP DEFENDANTS orally agreed to grant Kendall Mosing a security interest in all equipment and buildings, totally consistent with the security interest stated in the April 2013 Private Placement Memorandum accepted by ZLOOP for the initial commitments of $1 and $4 million from Kendall Mosing.

75.     On October 9, 2013, LABARGE emailed Sean Leblanc and Marian and Jim Janes, all in Lafayette, Louisiana, signature pages for subscription to the Private Placement Memorandums discussed above.  These are the same signature pages that Kendall Mosing was instructed by LABARGE to execute when he was in Hickory, North Carolina in August 2013. Sean Leblanc executed these documents in Lafayette, Louisiana and returned them to LABARGE as per his request, back dated like they were when Kendall Mosing was instructed to sign them.  A copy of the email and attachment is attached as **Exhibit 32**.

76.     On or about November 15, 2013, the Austin investors terminated their security interest against ZLOOP in North Carolina, presumably because Kendall Mosing's funds had been used by ZLOOP to pay them off.

**Q.    Defendants email more misrepresentations into Lafayette, Louisiana to trick Kendall Mosing into giving Zloop an additional $5 million.**

77.    On November 29, 2013, BOSTON emailed Jim Janes in Lafayette, Louisiana and represented that Zloop, LLC was six days from being fully operational but funds had about run out once again.  BOSTON strongly promoted the idea of Kendall Mosing exercising his option on the Texas franchises (to raise an additional $6,000,000 of capital) and providing "a letter of credit which would cost him nothing and he would not have to use any of his own money.  It could keep doing whatever it is doing without interruption."  BOSTON further represented that the line of credit he was promoting in the amount of $5,000,000 would be used only for the following:

a.   pay Jim Janes $400,000;

b.   pay Kendall Mosing $500,000 (the interest on the $3,500,000 loan);

c.   spend $3,000,000 to purchase a new building and equipment to process white goods;

d.   purchase property for the Super Center in Opelousas, LA for $250,000;

e.   to pay off Jim Janes' mortgage;

f.    the remainder to be used as a cushion.

Although Kendall Mosing did ultimately agree to facilitate a $5,000,000 line of credit for Zloop, LLC, which is discussed in detail below, Kendall Mosing was not paid the $500,000 promised and the Louisiana Super Center property in Opelousas, Louisiana was not purchased.    The structure of the line of credit represented by BOSTON was also a misrepresentation, as it required Kendall Mosing to assign $5,000,000 to the lending bank as collateral for the loan, completely tying up these funds and requiring Kendall Mosing to use his own money.  BOSTON'S statement about being six days until fully operational was also a misrepresentation

37

as the facility did not become operational until April 1, 2014.  All of these misrepresentations were designed to sell additional securities in ZLOOP using high-pressure sales tactics created by stated emergency needs for funding.  A copy of this email is attached as **Exhibit 33**.

**R.     ZLOOP DEFENDANTS email Kendall Mosing a UCC1 financing statement allegedly filed in North Carolina; said statement proves less than authentic.**

78.     On December 5, 2013, LABARGE emailed Jim Janes in Lafayette, Louisiana, at the direction of BOSTON, an email with "UCC1" in the subject line and forwarding a document entitled UCC FINANCING STATEMENT with a stamp showing that it was filed with the North Carolina Secretary of State, Elaine F. Marshall, on December 3, 2013 at 9:00 AM.  In fact, as detailed below, Jim Janes and Kendall Mosing later[7] discovered that this document was never filed.  When Jim Janes brought this fact to the attention of BOSTON, BOSTON cursed Jim Janes and threatened to sue him.  These actions create only one logical inference—that the UCC1 was fabricated by BOSTON and/or LABARGE to further entice Kendall Mosing into making additional investments into ZLOOP.  At this point in time Kendall Mosing had invested in excess of $14,000,000 in ZLOOP and BOSTON and LABARGE were trying to have him invest another $6,000,000 for the Texas franchises and $5,000,000 for a line of credit.  The UCC1 listed Kendall Mosing as the secured party and his address as being his home in Lafayette, Louisiana. The debtor was listed as Zloop, LLC.  The collateral listed on the UCC1 was: "all goods, tools, machinery, furnishings, furniture and other equipment and fixtures of every kind now existing." The quoted collateral language was cut and pasted from item 2(b) in the Security Agreement that was part of the April 2013 Private Placement Memorandum issued by ZLOOP.  The remaining collateral that was supposedly going to secure investments in ZLOOP in Section 2 of the Security Agreement were intentionally omitted to improve the position of ZLOOP and damage

---

[7] Unfortunately, this discovery was not learned until well after the damage complained of herein had been done.

MOSING.   A copy of the email from LABARGE forwarding the purportedly filed UCC1 FINANCING STATEMENT with attachment is attached as **Exhibit 34**.

79.    On December 17, 2013, Kendall Mosing executed an ASSIGNMENT OF DEPOSIT ACCOUNT assigning a checking account containing $5,400,000 of his funds with Patriot Bank in Texas, which agreed to a $5,000,000 line of credit to ZLOOP secured by Kendall Mosing's checking account.   As a result of this transaction Kendall Mosing's funds in his Patriot Bank checking account were locked, precluding him from using them—the money had to stay in his checking account to secure the line of credit.

80.    On December 19, 2013, BOSTON instructed Patriot Bank to wire $1,000,000 of the $5,000,000 line of credit to Kendall Mosing's checking account at Patriot Bank securing the ZLOOP line of credit.   This was ostensibly done to make a partial payment on outstanding obligations to Kendall Mosing, but was merely using Kendall Mosing's money to pay him back and was part of the scheme to continue securing funds from Kendall Mosing.   BOSTON copied Kendall Mosing in Lafayette, Louisiana with this wire transfer email instruction to Patriot Bank in Texas.   When the $1,000,000 transfer was made to Kendall Mosing's account, the increase in the balance only served to increase the amount of security Patriot Bank could draw on if ZLOOP defaulted on the line of credit.

**S.    ZLOOP DEFENDANTS push Kendall Mosing Kendall to purchase Texas franchise securities on the basis of imminent funds being raised by New York investment firm and promises to be quickly repaid.**

81.    The scheme of fraud perpetrated by the ZLOOP DEFENDANTS described herein continued to fester because on January 2, 2014 Kendall Mosing agreed to exercise his option to purchase all eight Texas franchises for $10,000,000.   This option exercise agreement was

documented in a letter drafted by Jim Janes in Lafayette, Louisiana and signed by Kendall Mosing in Lafayette, Louisiana.  Payments for the option were as follows:

> a.  $1,000,000 down payment on June 11, 2013;
>
> b.  $7,500,000 in outstanding loans were applied to the option;
>
> c.  $700,000 of interest on the foregoing loans were applied to the option; and
>
> d.  $800,000 would be owed by Kendall in a note payable to Zloop, LLC.

The eight Texas franchise books were sent to Kendall Mosing in Lafayette, Louisiana *via* Federal Express.  Kendall Mosing never signed any documents at that time like he had done for the three Louisiana territories.  The books delivered did not contain any appropriate paperwork for signing as was the case in the Louisiana books.  Not long after the eight Texas books had been sent to Kendall Mosing, LABARGE stated that he wanted all the books sent back to headquarters to allegedly update them with the changes ZLOOP had unilaterally made to the franchise model.  Kendall Mosing hand carried all the books back to Hickory on his next trip there. Neither Kendall Mosing, nor Jim Janes, have seen the books since Mosing returned them. A copy of the option exercise agreement is attached as **Exhibit 35**.

82.    January 15, 2014 is the date on Subscription Agreements between ZLOOP and Kendall Mosing and Sean Leblanc in which both agreed to pay $1,000,000 for a 1% interest in Zloop, LLC based on a $100,000,000 valuation.   Kendall Mosing and Sean Leblanc signed these documents in Lafayette, Louisiana and returned same to ZLOOP for execution.  Despite repeated requests for fully executed copies of these securities ZLOOP has never provided same to Kendall Mosing.  The $100,000,000 valuation was totally arbitrary, speculative and out of touch with any notion of reality, in a word, misleading.

**T.    Loeb Partners Corporation is retained to raise the funds Defendants promised to buy Kendall's Texas franchises and pay off other advances.**

83.    On February 5, 2014, Zloop, LLC retained an investment banking company out of New York called Loeb Partners Corporation (Loeb) to raise capital.  On or about this time Loeb advised BOSTON and LABARGE that the franchise model would not work for this business and that all franchises should be bought back and all operations of the company corporatized.  Loeb immediately began work toward raising funds to buy back all the franchises and corporatize Zloop, LLC, including the conversion of Zloop, LLC from a limited liability company to a corporation.

84.    On February 7, 2014, Jim Janes drafted, in Lafayette, Louisiana, a letter that he emailed to BOSTON dealing with the terms under which Kendall Mosing would sell his franchise rights.  At the time there was still outstanding paperwork that Kendall Mosing needed to execute regarding his purchase of the Texas franchises.  When Kendall Mosing decided to purchase the Texas franchises, the ZLOOP DEFENDANTS represented to Kendall Mosing that he should do so and sell them back to ZLOOP along with the Louisiana franchises at a profit in light of the financing to be secured by Loeb.  Unfortunately, as is detailed below, BOSTON and LABARGE prevented that from ever happening by terminating Loeb's engagement prematurely. Among the points agreed to by BOSTON, on behalf of ZLOOP, in this letter is that if Kendall Mosing does not receive $9,200,000 in franchise buy-back payments for his Texas franchise territories, the $9,200,000 of loans listed in the letter would revert back to loans to the company. Because Kendall Mosing has never received any franchise buy-back payments for his Texas franchise territories, and will not receive such payments now that fund raising activities have ceased, Kendall Mosing's Texas franchise purchase was nullified, $9,200,000 of loans revert back to loans to the company and the $800,000 note payable by Kendall Mosing to Zloop, LLC

was nullified.  A copy of Janes' email, the draft letter and BOSTON'S signed version is attached as **Exhibit 36**.

**U.**     **Warrants, warrants and more warrants**

85.     On March 14, 2014, LABARGE emailed Jim and Marian Janes in Lafayette, Louisiana Grant and Subscription Agreements for Marian Janes, Sean Leblanc and Kendall Mosing to execute.  None of the Grant Agreements contained the form of the warrant supposedly being agreed to.  Also, the documents forwarded by LABARGE were dated well before March 14, 2014, continuing his and BOSTON'S long-standing practice of back-dating documents.  The documents also demonstrated $3,000,000 of pure equity investment by Kendall Mosing into ZLOOP,[8] allegedly constituting a 3% interest at the stated and misleading and imaginary valuation amount of $100,000,000.

86.     On March 19, 2014 LABARGE emailed Jim Janes in Lafayette, Louisiana additional documents for him to get Kendall Mosing and Sean Leblanc to sign.  Among the documents forwarded was a WRITTEN CONSENT OF STOCKHOLDERS OF ZLOOP, INC. TO ACTION WITHOUT MEETING.  Kendall Mosing was instructed to sign this document, with blanks for the date, in which he approved of the conversion of Zloop, LLC from a limited liability company to a corporation with two board members, BOSTON and LABARGE.  Shortly after receipt, Kendall Mosing and Sean Leblanc executed these documents, in Lafayette, Louisiana, and returned same to LABARGE as requested.  Again, despite repeated requests, copies of fully executed documents have never been provided to MOSING.  A copy of this email and attachment is attached as **Exhibit 37**.

---

[8] $1,000,000 of this investment was to purchase a 1% interest that Kendall Mosing contemplated transferring to Sean Leblanc at a later date pursuant to an applicable exemption.

**V.      Zloop needs to raise the line of credit and converts to a corporation.**

87.      On March 21, 2014, BOSTON emailed Jim Janes in Lafayette, Louisiana an email discussion earlier that day between BOSTON and one of the advisors at Loeb.  In that earlier discussion BOSTON stated that the company needed to raise its line of credit by another $8,000,000 to purchase equipment and real estate in Reno, Nevada and provide for working capital.  As part of the first round of funding through Loeb the $8,000,000 line of credit would be paid off.  Of course, BOSTON was looking to Kendall Mosing to agree to increase the line of credit to use for these purposes.  The email is attached as **Exhibit 38**.  As discussed below, the line of credit was later increased with the assistance of Kendall Mosing, but by $9 million.

88.      On March 26, 2014, Zloop, LLC filed the paperwork converting itself to a Delaware corporation.  The Certificate of Incorporation states that 100,000 shares of common stock are authorized in one class only.  The Certificate of Incorporation does not mention any forum selection clause for disputes between the corporation and its owners or between the owners themselves.

89.      Also on March 26, 2014, Zloop, Inc. issued stock certificates to Kendall Mosing for 100 shares, amounting to 1% of the 10,000 issued and outstanding shares when, in fact, Kendall Mosing purchased and is otherwise entitled to substantially more shares than this.

**W.      Franchise buy-back offer**

90.      On March 27, 2014, ZLOOP tendered a written offer to Kendall Mosing in Lafayette, Louisiana to buy back his Texas and Louisiana franchises.  The offering claimed exemption from registration of the securities being offered on Section 4(a)(2) of the Securities Act of 1933, but no Form D was ever filed for Zloop, Inc. as was the case for Zloop, LLC.  The document is complex and contained multiple equally complicated attachments including a

CONFIDENTIAL OFFER LETTER stating that there were 10,000 issued and outstanding shares for Zloop, Inc. as of March 27, 2014. However, the overall objective of the documents was to provide a franchise owner the option to sell back his or her franchise rights through one of two options: (1) an equity option where the franchise holder would get stock and warrants in exchange for his or her franchises; or (2) a rescission option in which the franchisee would get back the amount of money he or she spent on franchises. While the options were meant to be mutually exclusive, Kendall Mosing executed the paperwork, in Lafayette, Louisiana, selecting both options on or about April 1, 2014, nullifying said option exercise. Moreover, ZLOOP never even attempted to accept Kendall Mosing's conflicting offers, and acceptance was a legal and specifically stated prerequisite to the validity of the contract. The written offer from ZLOOP therefore expired by its own terms on April 30, 2014 with Kendall Mosing maintaining his position as owner of all franchise rights in Texas and Louisiana. Moreover, the written offer contained an implied resolutory condition, namely that Loeb was working on a subsequent offering to fund the franchise buy backs: once Loeb was terminated that condition expired, nullifying any contract upon which it was based.

91.     In violation of La. R.S. § 51:1821 *et seq.* and 15 U.S.C.A. § 78cc(a), the March 27, 2014 written offer purported to require Kendall Mosing to waive all rights he had against ZLOOP, even if unknown, protected by this and other state and federal laws. Among the rights said written offer sought to have Kendall Mosing waive included the right to file this action in his own choice of forum, Lafayette, Louisiana. Any such waiver provisions are null and void due to their violation of La. R.S. §  51:1821 *et seq.* and 15 U.S.C.A. § 78cc(a). In violation of the Louisiana Blue Sky laws at La. R.S. § 51:702 *et seq.*, the ZLOOP DEFENDANTS made the following non-exclusive list of material misrepresentations pursuant to the March 27, 2014 offer:

a.   The Super Center in Opelousas, LA would be operational by the fourth quarter of 2014—the land for same has still never been purchased;

b.   ZLOOP was valued at $100,000,000.00,[9] a completely arbitrary number with no information or evidence to support it whatsoever;

c.   That in connection with the franchise buy-back, Loeb Partners would raise capital to fund ZLOOP's obligations under the Rescission option; however, ZLOOP terminated Loeb partners on the basis that no additional fundraising was needed.

Material omissions of fact were also made, including but not limited to:

a.   a failure to disclose that the ZLOOP DEFENDANTS fabricated a UCC1 and forwarded same to Kendall Mosing through email with a false statement that it had been filed with the North Carolina Secretary of State;

b.   who owned the 10,000 shares of issued and outstanding common stock;

c.   who owned other stock rights in ZLOOP;

d.   a failure to disclose that the two PPMs issued by ZLOOP were incomplete and inaccurate and created substantial liability for the ZLOOP DEFENDANTS;

e.   a failure to disclose that the conversion of Zloop, LLC to Zloop, Inc. invalidated warrants issued earlier granting the right to purchase Class B units;

f.   Mike Watson quit because he was not getting paid;

g.   a failure to disclose how LLC units would be converted into corporate shares at the March 26, 2014 conversion;

h.   a failure to disclose that the conversion of Zloop, LLC to Zloop, Inc. resulted in a change in control of ZLOOP, namely that Kendall Mosing now controls the majority of voting shares;

---

[9] This representation was made on page 4 of the March 27, 2014 Offer Letter.

i.   a failure to disclose the amount in each LLC unit holder's capital account at conversion since the PPMs offered by ZLOOP stated that if the company ever converted to a corporation LLC unit members would be issued stock in proportion to their capital accounts;

j.   a failure to disclose that paperwork filed with the IRS was improperly executed by management and could expose former LLC owners to adverse tax consequences;

k.   a failure to disclose how the Class B shares of former LLC unit owners would be converted into a corporate capital structure that did not allow for Class B shares;

l.   a failure to disclose how the 13,960,000 units of the LLC, according to Exhibit A of Zloop, LLC's April 2013 PPM, was changed to 10,000 shares of Zloop, Inc. stock, including disclosure of who owned what percent of said stock;

m.   a failure to disclose how Kendall Mosing went from owning 200,000 units of Zloop, LLC, according to Membership Certificate No. 2 issued on October 15, 2012, to 100 shares of Zloop, Inc.

n.   a failure to disclose that the ZLOOP DEFENDANTS failed to cooperate with Loeb and ignored even the most basic due diligence requests necessary to raise the funds needed for the franchise buy-back offering and even made the commercially unreasonable demand that they receive sheets from potential lenders/investors before the ZLOOP DEFENDANTS would provide the potential lenders/investors due diligence information;

o.   a failure to disclose the ZLOOP DEFENDANTS' willful failure to file a Form D;

p.   a failure to disclose how franchises that did not participate in the offering would be handled by ZLOOP.

**X.**   **Zloop again turns to Kendall Mosing's most trusted advisers to convince him to increase the line of credit by an additional $9 million.**

92.    On April 22, 2014, BOSTON forwarded to Jim Janes in Lafayette, Louisiana an email discussion between BOSTON and Loeb saying that Loeb can raise the new capital needed and that this is a legitimate use of new capital to pay off existing bank debt.  On information and belief, BOSTON'S intent in sending this email to Jim Janes was to convince Kendall Mosing that if he agreed to raise the line of credit to help the business Loeb could raise the money to pay him back in short order.  The email is attached as **Exhibit 39**.

93.    On April 22, 2014, BOSTON, again waiving any privilege or confidentiality with ZLOOP's attorneys, forwarded to Kendall Mosing and Jim and Marian Janes an email from Parker Poe discussing a draft Warrant Grant Agreement for Kendall Mosing to execute.  This was being done as part of ZLOOP's efforts to have Kendall Mosing increase the existing $5 million line of credit.  As can be seen, Kendall Mosing was being granted warrant rights to purchase 1.2% of Zloop, Inc.'s shares.  No statement as to the amount of outstanding shares was provided, and the date of the warrant was also left blank.  The actual warrant that was contemplated by the Warrant Grant Agreement was not included.  Despite this being a security under state and federal law, no disclosures were provided.  It was stated that the warrant exercise price will be calculated on a $100 million value of ZLOOP.  As stated repeatedly before, this valuation is totally arbitrary, unfounded and misleading.   Kendall Mosing executed this document on April 23, 2014 in Lafayette, Louisiana.  A copy of the email is attached as **Exhibit 40**.

94.    On April 29, 2014, Kendall Mosing executed the contemplated Warrant authorizing him to purchase 120 shares of common stock at a price of $10,000 per share.  Despite this being a security under state and federal law, no disclosures were provided and no

notice filings were ever made with the SEC or Louisiana Securities Commission evidencing the use of an exemption.  The same day Kendall Mosing assigned an additional $9,000,000 of funds on deposit under his name at Patriot Bank, which allowed Zloop, LLC to execute paperwork that day increasing its line of credit to $14,000,000.  As of this point in time Kendall Mosing had invested in excess of $28 million into ZLOOP.

**Y.  Zloop, LLC is the bank's problem, not ours.**

95.     On May 12, 2014, LABARGE waived any privilege and confidentiality between ZLOOP and its attorneys at Parker Poe by forwarding to Jim Janes, in Lafayette, Louisiana, a May 9, 2014 email communication from a Parker Poe attorney to LABARGE pointing out that the Patriot Bank line of credit increase was documented in the name of Zloop, LLC instead of Zloop, Inc. and that Zloop, LLC did not exist as of the time of the loan on April 29, 2014. Counsel suggests that as long as the line was drawn to its limit, this would be the bank's problem, not a problem for the ZLOOP DEFENDANTS.   Shortly after this, ZLOOP, as discussed further below, maxed out the line of credit by borrowing the full $14 million.  The email also provided instructions for Kendall Mosing to execute the warrants provided for his services regarding the Patriot Bank line of credit.  Kendall Mosing signed these warrants on or about May 13, 2014 in Lafayette, Louisiana.  Despite this being a security under state and federal law, no disclosures were provided.  The email from Parker Poe also describes the ZLOOP minute book.  Despite repeated request for copies of same, this documentation has never been provided to Kendall Mosing.  A copy of this email is attached as **Exhibit 41**.

96.     On or about May 29, 2014, Jim Janes and Kendall Mosing, having become concerned about out of control expenditures that totally contradicted the agreed upon uses of the increased line of credit in ZLOOP's March 21, 2014 email to Loeb, and repeated failures to

provide documentation due Kendall Mosing, decided to call Patriot Bank's loan officer on the line of credit, Bill Holmes, to discuss pre-approval of any further draw downs on the line of credit.  Bill Holmes initially told Jim Janes and Kendall Mosing that Kendall Mosing had the absolute right to pre-approve further draw downs.  In reliance on this statement, Jim Janes contacted BOSTON and/or LABARGE and advised them that any future draws required prior approval from Kendall Mosing.  Later, Bill Holmes called Jim Janes, this time with Patriot Bank's attorney, saying that he had been wrong earlier and that Kendall Mosing had no legal right to preapprove the loans on the line of credit.  By then, however, Kendall Mosing had already relied on Bill Holmes statement to Mosing's detriment.  Also on May 29, 2014, BOSTON threatened Jim Janes with legal action.  The email in which this threat was made is attached as **Exhibit 42**.

**Z.      Mosing discovers the fraudulent scheme.**

97.      On June 23, 2014, Kendall Mosing, from Lafayette, Louisiana, emailed BOSTON asking why no information about his security interest in the equipment and building in Hickory could be located.  A copy of the email is attached as **Exhibit 43**.

98.      Also on June 23, 2014, Jim Janes, from Lafayette, Louisiana, emailed BOSTON also asking about the lack of a UCC1 having been filed as promised, and threatening legal action. In response, the same day, BOSTON cursed out and threatened legal action against Jim Janes in an email.  A copy of the email is attached as **Exhibit 44**.

99.      On July 2, 2014, ZLOOP terminated its deal with Loeb, effective August 2, 2014.

# V.   FEDERAL SECURITIES CLAIMS

## COUNT 1(a)—FEDERAL VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5

100.    The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully restated herein.

101.    As more fully described in paragraphs 1 through 99 above, the ZLOOP DEFENDANTS, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: knowingly used and employed devices, schemes and artifices to defraud; knowingly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and knowingly engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

102.    The ZLOOP DEFENDANTS knowingly, intentionally or recklessly engaged in the devices, schemes, and artifices as described above.

103.    The ZLOOP DEFENDANTS knowingly violated §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 in that they:

    a.   Employed devices, schemes and artifices to defraud;

    b.   Made untrue statements of material facts or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as detailed below; or

    c.   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff.

104.   The ZLOOP DEFENDANTS knowingly offered for sale and did sell securities that were not registered.  Because ZLOOP was represented by experienced securities counsel, the knowledge of their attorneys knowing that such a Form D filing is required is imputed to the ZLOOP DEFENDANTS, making the failure to file the Form D willful and an exercise of bad faith.  The ZLOOP DEFENDANTS will not be able to carry their burden of proof of their claimed exemption from registration, created by 17 C.F.R. §230.508, due to the lack of any Form D filing required by Regulation D at 17 C.F.R. 239.500 along with other violations of claimed exemptions.

105.   The Form D filing required the ZLOOP DEFENDANTS to disclose the following terms, conditions, requirements or information, all of which was directly intended to protect MOSING:

    a.   That Jim Janes was a related person;

    b.   That the only directors were BOSTON and LABARGE;

    c.   That Jim Janes and Kendall Mosing were not directors;

    d.   Which registration exemptions were claimed;

    e.   The duration of the offerings;

    f.   The amount of compensation being paid to dealers like Jim Janes;

    g.   The amount of securities sold to date pursuant to the offerings;

    h.   The number of non-accredited investors being offered or sold securities;

    i.   The amount of commissions or finders' fee expenses being paid to anyone like Jim Janes;

    j.   The amount of the proceeds to be used for payments to LABARGE or BOSTON;

k.  Irrevocably appointing the Louisiana Secretary of State as the agent for service of process of ZLOOP, and that service may be made by registered or certified mail;

l.  That BOSTON and LABARGE do not have a relevant criminal conviction, regulatory or court order or other disqualifying event that occurred on or after September 23, 2013;

m.  BOSTON and LABARGE would certify that the information contained in the Form D is true and correct.

A blank Form D, along with SEC Instructions, is attached as **Exhibit 45**. This information, terms, conditions and requirements were clearly designed to protect MOSING. Thus, the ZLOOP DEFENDANTS will not be able to carry their burden of proving entitlement to any exemption as required by 17 C.F.R. §230.508(a)(1).

106.   Although Kendall Mosing was an accredited investor because of his net worth, he is unsophisticated in terms of financial and securities matters, a fact the ZLOOP DEFENDANTS recognized and capitalized on by making Kendall Mosing's trusted advisor, Jim Janes, a ZLOOP agent.  Moreover, the ZLOOP DEFENDANTS offered and sold securities to unaccredited investors, including Marian Janes (Jim Janes' wife) and Sean Leblanc (Kendall Mosing's friend), who the ZLOOP DEFENDANTS knew were unsophisticated.  This was a key part of the ZLOOP DEFENDANTS' scheme to deceive Kendall Mosing.  For these additional reasons the ZLOOP DEFENDANTS will be unable to carry their burden of proving an applicable exemption to registration requirements.

107.   The ZLOOP DEFENDANTS knowingly utilized the services of unregistered securities dealers, including Jim Janes, and paid said dealers undisclosed commissions for securing investments by Kendall Mosing for ZLOOP.

108.   At the particular times and places detailed herein, the ZLOOP DEFENDANTS offered to sell and did sell MOSING the following securities as defined by federal and Louisiana law:

    a.   Units in ZLOOP through PPMs and otherwise;

    b.   Warrants to purchase additional units in ZLOOP;

    c.   Shares of ZLOOP through PPMs and otherwise;

    d.   Warrants to purchase additional shares in ZLOOP;

    e.   Investment contracts regarding franchise operations;

    f.   Investment contract regarding franchise buy back offer;

    g.   Investment contract entitled TERM SHEET and dated September 30, 2013;

    h.   Investment contract dated September 23, 2013 regarding option to purchase Texas franchise rights;

    i.   Promissory notes sold by the ZLOOP DEFENDANTS to raise money for the general use of the business and where Kendall Mosing was interested primarily in the profit the note was expected to generate;

    j.   UCC1 financing statement;

    k.   Grant Agreement; and

    l.   Subscription Agreements.

109.   In the process of selling the foregoing securities, LABARGE and BOSTON, on behalf of the Zloop entities, made the following material misrepresentations of fact to Kendall

Mosing, discussed in greater detail above, with the specific intent of securing investment funds from him to their benefit and the detriment of Kendall Mosing:

a. That Kendall Mosing would receive a security interest in all property, plant and equipment and preemption rights in any future offerings pursuant to the April 2013 Private Placement Memorandum;

b. That a UCC1 had been filed in North Carolina securing Kendall Mosing's investments, as represented in the Private Placement Memorandum issued by ZLOOP in April of 2013;

c. The time within which the Zloop franchisor business would be operational and enable franchisees to operate and generate revenue for ZLOOP;

d. That Kendall Mosing and Jim Janes would be on the Board of Directors when they never had any intention of making them actual directors;

e. That the March and April 2013 PPMs were exempt from registration under Regulation D without stating that they were failing to file the requisite Form D after they sold securities;

f. That ZLOOP had an $80, $100 or $300 million valuation;

g. That, as of March 21, 2014, ZLOOP would pay off the increase in the line of credit collateralized by Kendall Mosing as part of the first round funding secured by Loeb when in fact ZLOOP terminated Loeb on July 2, 2014;

h. That, as of March 18, 2013, ZLOOP was to become "the largest eWaste Recyclers in the world;"

i. That as of March 7, 2013 ZLOOP was two weeks away from securing $10 million in investment through the PPM to be followed by an immediate additional round

54

of funding in the $50 million to $100 million range and that Kendall Mosing would be repaid the $4 million he was owed at the close of the PPM; in fact the ZLOOP DEFENDANTS refused to close the PPM, creating liability for them with the Austin investors that Kendall Mosing ended up financing;

j.   That actually receiving the equity bargained for would result in adverse tax consequences, manipulating Kendall Mosing into accepting worthless warrants instead, as a result of the misleading and untrue valuation placed on the Zloop entities;

k.   That Kendall Mosing owns only 100 shares of Zloop, Inc. as of March 26, 2014;

l.   That as of March 27, 2014:

   i.   The Super Center in Opelousas, LA would be operational by the fourth quarter of 2014—the land for same has still never been purchased;

   ii.   The company was valued at $100,000,000;

   iii.   In connection with the franchise buy back, Loeb would raise capital to fund the Company's obligations under the Rescission Option when in fact ZLOOP terminated Loeb on the basis that no additional fund raising was needed;

m.   That before the ZLOOP DEFENDANTS would convert Zloop, LLC to a corporation they would use a different operating agreement than the one contained in the PPM, one that would not entitle LLC unit owners to "stock in the new corporation in proportion to their respective Capital Accounts…;"

n.   That as of November 29, 2013 ZLOOP was six days from being fully operational when in fact they did not become operational until April of 2014;

o.      That Kendall Mosing would guarantee a line of credit such that Kendall Mosing would not have to use any of his own money, not have to assign funds to secure the line of credit;

p.      That the $5 million line of credit funds would be used in part to purchase property for the Super Center in Opelousas, LA;

q.      That an e-waste recycling center would imminently be built and operational in Opelousas, Louisiana;

r.      That the funds invested as a result of the September 30, 2013 Term Sheet investment contract would be used to settle with the Austin investors and pay other current liabilities when defendants intended to and did use the funds for other purposes;

s.      That immediately upon the funding of the $3 million loan pursuant to the September 30, 2013 Term Sheet investment contract ZLOOP would issue Kendall Mosing sufficient units to raise his interest to 7%;

t.      The inaccurate and misleading forward looking statements made in the March and April 2013 PPMs, including but not limited to projections of revenue and income/loss and number of units, are not protected by the safe-harbor provisions of the Securities Exchange Act because they relate to a limited liability company;[10]

u.      Even after being told by McGuireWoods in June of 2013 that the PPM was inaccurate and incomplete, the ZLOOP DEFENDANTS sold Kendall Mosing $1 and $4 million subscriptions to the PPM  in August of 2013 knowing that their attorneys were telling them that the PPM was inaccurate and incomplete;

---

[10] Securities Exchange Act § 21E(b), 15 U.S.C.A. § 78u-5(b).

v.      That the January 25, 2013 draft version of the ZLOOP Private Placement Memorandum sent to Kendall Mosing through Jim Janes included financial forecasts that were totally unbacked and included assumptions improperly omitted from the final versions of the PPM in March and April of 2013;

w.      BOSTON's financial projections forwarded to Kendall Mosing through Jim Janes on October 5, 2012 were totally unbacked and arbitrary and failed to reflect reality, that ZLOOP would only start generating revenue in April of 2014, and then nowhere near the amount projected;

x.      That the ZLOOP DEFENDANTS had created a proprietary, 426-page OPERATIONS MANUAL that would allow Zloop franchises to operate efficiently and profitably, thereby increasing the revenue and value of ZLOOP, despite the ZLOOP DEFENDANTS never having published same, even as of the date of this filing;

y.      That legal counsel for ZLOOP was preparing all ownership documentation requested by Kendall Mosing, and that Kendall Mosing would actually receive fully executed copies of documents he had signed, along with all other supporting documentation regarding his interests at issue herein;

z.      That Kendall Mosing was purchasing equity through a Private Placement which never actually occurred, although Kendall Mosing's money was never refunded;

aa.     That ZLOOP would implement a sophisticated inventory control system that is both on secure servers as well as secure cloud platforms to allow franchisees to track incoming and outgoing ewaste;

bb.     That Kendall Mosing must immediately invest additional money into ZLOOP or else ZLOOP would close and Kendall Mosing would lose his entire investment;

cc.     That ZLOOP was engaging a professional firm to raise capital, re-pay all amounts owed to Kendall Mosing, and buy back all franchises—a firm that has since been terminated by ZLOOP and which ZLOOP clearly never intended to utilize;

dd.     That the consistent backdating of documents was necessary to protect Kendall Mosing's financial interests;

ee.     That Kendall Mosing would personally guarantee a line of credit, not pledge a checking account with the full amounts loaned to the ZLOOP DEFENDANTS under the line of credit;

ff.     Grossly overstating the revenue and profit potential of the defendant businesses in BOSTON'S email of 5-year projections to Jim Janes on October 5, 2012;

gg.     Grossly overstating the revenue and profit potential of the defendant businesses in LABARGE'S email to Jim Janes forwarding a Louisiana prospectus on October 2, 2012;

hh.     Stating in franchise disclosure documents that the ZLOOP DEFENDANTS had created a proprietary operation's manual to operate the franchise businesses efficiently when no such manual exists even today; and

ii.     That the ZLOOP DEFENDANTS would unilaterally modify the FRANCHISE AGREEMENT without any notice to franchisees.

110.    The facts and circumstances in existence when the foregoing misrepresentations were made demonstrate that MOSING reasonably relied on the ZLOOP DEFENDANTS' misrepresentations.

111.    The ZLOOP DEFENDANTS had a duty to disclose material facts to MOSING because LABARGE and BOSTON were officers and directors of the Zloop entities, creating fiduciary duties on officers and directors to owners, and Kendall Mosing owned equity interests in those companies.  The ZLOOP DEFENDANTS also had a duty to disclose material facts to make their partial disclosures non-misleading. The ZLOOP DEFENDANTS also had a duty to disclose all material information relating to the securities they were attempting to sell Kendall Mosing.  The ZLOOP DEFENDANTS had a duty to disclose the information required pursuant to federal Form D.  The ZLOOP DEFENDANTS also acted, through their actions and those of their agents, as unlicensed investment advisers, as defined by 15 U.S.C.A. §80b-2(a)(11), to Kendall Mosing.  In the process of selling the foregoing securities, LABARGE and BOSTON, on behalf of the Zloop entities, made the following material omissions of fact to Kendall Mosing with the specific intent of securing investment funds from him to the benefit of the company and the detriment of Kendall Mosing:

    a.   That the UCC1 sent to Kendall Mosing as evidence of the perfection of his security interest was fabricated by BOSTON and/or LABARGE to deceive Kendall Mosing into believing that he was protected when he was not;

    b.   That the UCC1 sent to Kendall Mosing as evidence of the perfection of his security interest was not actually filed and would never actually be filed by defendants;

    c.   That LABARGE and BOSTON were using Jim Janes as an unregistered securities dealer and paying him commissions for getting Kendall Mosing, referred to as the "Bank of Louisiana," to continue investing funds into the Zloop operations;

    d.   That the ZLOOP DEFENDANTS, having assumed the duty of acting as Kendall Mosing's investment advisor, failed to timely disclose that the structure of the Term

Sheet investment contract could create a substantial tax liability for him until after the deal was done and they already had Kendall Mosing's money, thereby forcing him to take worthless warrants instead of the equity he bargained for;

e. The information required to be disclosed in federal Form D;

f. That the WRITTEN CONSENT OF STOCKHOLDERS OF ZLOOP, INC. TO ACTION WITHOUT MEETING that Kendall Mosing was asked to sign on March 19, 2014 would convert the LLC into a corporation with no Class B shares, invalidating Kendall Mosing's LLC warrants and that Kendall Mosing would only be issued 100 shares in the new corporation without a disclosure of currently outstanding and issued shares;

g. Failing to disclose that the arbitrary and unrealistic valuation of ZLOOP could create a substantial tax liability if Kendall Mosing was awarded the 5% stock called for by the term sheet until after the money had been transferred;

h. Failing to disclose that the arbitrary and unrealistic valuation of ZLOOP implied by the warrants defendants sold Kendall Mosing rendered them worthless;

i. Failing to disclose that the conversion of Zloop, LLC to a corporation would invalidate Kendall Mosing's warrants to purchase 5% of Class B units because the corporation did not have Class B shares;

j. That his investment funds would be spent on purposes other than those agreed to when investing, including but not limited to lavish shopping trips for the founder's wives in Chicago and expenditures on racing to help advance the racing career of BOSTON'S son;

k.  That he was paying commissions to Jim Janes for his assistance in securing investment from Kendall Mosing;

l.  That he would never be provided the evidence of his equity investments;

m.  That he would not receive fully executed versions of the contracts he signed;

n.  That the ZLOOP DEFENDANTS would take back and unilaterally change the franchise agreements for the Texas franchises purchased by MOSING and never return them even to this date, all around the time Kendall Mosing was presented with an offer to have ZLOOP buy back all of his franchises pursuant to an investment contract solicited by ZLOOP;

o.  That the warrants Kendall Mosing received in exchange for his investment in the company were worthless, several failed to list the exercise price, several failed to list the number of shares Kendall Mosing was entitled to purchase, and there was no documentation to account for the status of the warrants upon conversion of ZLOOP from an LLC to a corporation and that said conversion invalidated the warrants because they only allowed purchase of Class B shares which do not exist in the new corporation;

p.  That it would be a substantial amount of time before any progress was made toward building the Opelousas, Louisiana e-waste recycling supercenter;

q.  That the ZLOOP DEFENDANTS refused to cooperate with Loeb Partners and refused to turn over any due diligence or take any reasonable action towards participating in capital fundraising;

r.  That the ZLOOP DEFENDANTS had no intention of actually raising capital to repay Kendall Mosing and repurchase the franchises, and in fact terminated Loeb Partners;

s.   That Kendall Mosing would lose equity in ZLOOP upon its conversion to a corporation; and

t.   That Kendall Mosing would have no governance rights at all or any mechanism in which to protect the $28 million invested in the Company;

u.   That the ZLOOP DEFENDANTS would try to keep Kendall Mosing's ownership percentage the same as it had been before the conversion despite the language in the PPMs stating corporate shares would be issued based on the capital accounts of the members;

v.   That as of March 27, 2014, in the franchise buy back offer:

   i.    the ZLOOP DEFENDANTS fabricated a UCC1 and forwarded same to Kendall Mosing through email with a false statement that it had been filed with the North Carolina Secretary of State;

   ii.   who owned the 10,000 shares of issued and outstanding common stock;

   iii.  who owned the 700 warrants;

   iv.   the two PPMs issued by ZLOOP were incomplete and inaccurate and created substantial liability for the ZLOOP DEFENDANTS;

   v.    the conversion of Zloop, LLC to Zloop, Inc. invalided warrants issued earlier granting the right to purchase Class B units;

   vi.   Mike Watson quit because he was not getting paid;

   vii.  how LLC units would be converted into corporate shares at the March 26, 2014 conversion and how that different from the earlier PPMs;

viii.    the conversion of Zloop, LLC to Zloop, Inc. resulted in a change in control of ZLOOP, namely that Kendall Mosing now controls the majority of voting shares;

ix.    the amount in each LLC unit holder's capital account at conversion since the PPMs offered by ZLOOP stated that if the company ever converted to a corporation LLC unit members would be issued stock in proportion to their capital accounts;

x.    paperwork filed with the IRS was improperly executed by management and could subject former LLC owners to adverse tax consequences;

xi.    how the Class B shares of former LLC unit owners would be converted into a corporate capital structure that did not allow for Class B shares;

xii.    how the 13,960,000 units of the LLC, according to Exhibit A of ZLOOP's April 2013 PPM, was changed to 10,000 shares of Zloop, Inc. stock, including disclosure of who owned what percent of said stock;

xiii.    how Kendall Mosing went from owning 200,000 units of Zloop, LLC, according to Membership Certificate No. 2 issued on October 15, 2012, to 100 shares of Zloop, Inc.

xiv.    that the ZLOOP DEFENDANTS failed to cooperate with Loeb and ignored even the most basic due diligence requests necessary to raise the funds needed for the franchise buy-back offering and even made the commercially unreasonable demand that they receive term sheets from potential lenders/investors before the ZLOOP DEFENDANTS would provide the potential lenders/investors due diligence information;

xv.     the ZLOOP DEFENDANTS' failure to file a Form D after receipt of any investment funds; and

xvi.    how franchises that did not participate in the offering would be handled by ZLOOP.

112.    On June 23, 2014, BOSTON failed to respond to Kendall Mosing's email asking about the missing UCC1 in the Clerk of Court records by stating that there was no such UCC1 filed, that he and LABARGE had fabricated the one they sent to him earlier and misled him to believe the UCC1 had been filed when it had not.

113.    During the dates discussed above, the ZLOOP DEFENDANTS, individually and in concert, engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and course of business which operated as a fraud upon MOSING and made various untrue and deceptive statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to MOSING.   The purpose and effect of the scheme was to induce MOSING to invest in ZLOOP without obtaining equivalent value in return.   The ZLOOP DEFENDANTS even went so far as to use Kendall Mosing's most trusted advisor to further manipulate Kendall Mosing into investing even more money in ZLOOP.

114.    During the dates discussed above, the ZLOOP DEFENDANTS knew and/or recklessly disregarded the falsity of the foregoing statements.   BOSTON and LABARGE, as the senior officers and only directors for the Zloop entities, had access to the non-public information detailed above.

115.    During the dates discussed above, the Zloop entities acted through the individual defendants, whom the Zloop entities portrayed and represented to the press and public as its valid representatives.   The willfulness, motive, knowledge, and recklessness of the individual defendants are therefore imputed to the Zloop entities, which are primarily responsible for the securities law violations of the individual defendants while acting in their official capacities as company representatives, or, in the alternative, which is liable for the acts of the individual defendants under the doctrine of *respondeat superior.*

116.    During the dates discussed above, each of the ZLOOP DEFENDANTS knew or recklessly disregarded the fact that the above acts and practices, misleading statements, and omissions would improperly influence potential investors, like MOSING, to make investments in the ZLOOP DEFENDANTS that only benefited those defendants.

117.    Had MOSING known the truth instead of the misrepresented or omitted facts, he would have never invested over $28 million in ZLOOP.

118.    MOSING has suffered damages in that, in reliance on the material misrepresentations made by the ZLOOP DEFENDANTS, he paid artificially inflated prices for Zloop, LLC membership interests and Zloop, Inc. shares and has not received any security or documentation requested and promised.

119.    No valid forum selection clause executed by the parties governs this claim.

120.    BOSTON and LABARGE control and have controlled ZLOOP and are therefore jointly and severally liable under Section 20 of the Securities Exchange Act. Section 15 of the Securities Act creates joint and several liability for controlling persons for acts of controlled persons who are liable under Section 11 or 12 of the Securities Act.  BOSTON and LABARGE

conspired to commit the violations set forth herein and are therefore jointly and severally liable to MOSING, along with ZLOOP for MOSING's damages.

121.    28 U.S.C.A § 1658 requires that these claims be made no later than two years following the discovery of the facts constituting the violation and no more than five years after such violation.  No violations complained of herein occurred more than five years before this action was filed.  Moreover, MOSING only recently discovered the facts constituting the violations complained of herein, specifically having discovered the facts constituting the various violations in the last twelve months.

## COUNT 1(b)—FEDERAL VIOLATIONS OF SECTIONS 5 AND 12(a)(1) OF THE SECURITIES ACT OF 1933

122.    The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully restated herein.

123.    MOSING brings this claim under Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. §77l(a)(1), resulting from the sale of unregistered securities.

124.    Each of the Louisiana and Texas Franchise Agreements constitutes an investment contract and is therefore a "security" as that term is defined in Section 2(a)(1) of the 1933 Act, 15 U.S.C. §77b(a)(1).

125.    The Securities Act of 1933 requires all securities be registered unless an applicable exemption applies.

126.    No registration statement was filed or in effect for the securities offered and sold to Kendall Mosing.

127.    Notwithstanding the fact that the ZLOOP DEFENDANTS failed to file a registration statement, the ZLOOP DEFENDANTS offered and sold securities to Kendall Mosing, in violation of Section 12(a)(1).

128.    As a direct and proximate result of the conduct alleged herein, MOSING has suffered damages in connection with their investments with ZLOOP.

129.    The ZLOOP DEFENDANTS were, at all times, represented by competent legal counsel and can therefore be presumed to know that they were required to file a federal Form D even if they claimed a valid exemption from registration.  The ZLOOP DEFENDANTS were also told by their legal counsel that the PPMs they issued were incomplete and inaccurate. Numerous misrepresentations and omissions of fact by the ZLOOP DEFENDANTS have been identified herein regarding the PPMs and other securities.  The ZLOOP DEFENDANTS' failure to file the federal Form D was, therefore, willful, and invalidated any applicable exemption from federal registration requirements.

130.    Sections 5 and 12 of the Securities Act of 1933 provide plaintiffs a remedy for having been sold securities that are required to be registered but were not registered.

131.    Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, provides that, unless a registration statement is effective for the sale of such securities, it shall be unlawful for any person, directly or indirectly, to (1) make use of any means or instruments of transportation or communication in interstate commerce of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or delivery after sale.

132.    The sales of securities at issue involved the use of interstate commerce as described in detail herein. Liability for the sale of unregistered securities is strict.  MOSING need not show any degree of fault, neglect, or intentional act on the seller's part.  No proof of scienter is required.

133.     Upon tender of the securities at trial, MOSING is entitled to recover the full consideration paid for the securities and interest thereon.

### COUNT 1(c)—VIOLATION OF SECTION 15 OF THE SECURITIES ACT OF 1933 AGAINST DEFENDANTS BOSTON AND LABARGE

134.     The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully restated herein.

135.     This Count is brought pursuant to Section 15 of the Securities Act of 1933 ("Securities Act") against the Defendants BOSTON and LABARGE (the "Individual Defendants").

136.     Each of the Individual Defendants was a control person of ZLOOP by virtue of his position as a managing member, majority shareholder, director and/or officer of ZLOOP and during all times material to this action, the Individual Defendants did in fact exercise such control and were therefore "controlling persons" within the meaning of Section 15 of the Securities Act.

137.     By reason of their majority ownership, management positions and directorships at ZLOOP, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause ZLOOP to engage in the conduct complained of herein.

138.     Each of the Individual Defendants was a culpable participant in the violations of Section 5 and Section 12(a)(1) of the Securities Act alleged in Count 1(b) above, based on their having participated in the process which allowed the offering of unregistered securities to be successfully completed.

139.     MOSING has been damaged by the wrongful conduct of the Individual Defendants through their control of ZLOOP.

68

140.   The Individual Defendants exerted complete control over ZLOOP and were the agents of action for the acts complained of herein. By reason of such conduct, the Individual Defendants are jointly and severally liable pursuant to Section 15 of the Securities Act for all damages or losses suffered by MOSING.

### COUNT 1(d)—VIOLATION OF SECTION 20 OF THE SECURITIES AND EXCHANGE ACT OF 1934 AGAINST DEFENDANTS BOSTON AND LABARGE

141.   The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully restated herein.

142.   This Count is brought pursuant to Section 20 of the Exchange Act against Defendants BOSTON and LABARGE (the "Individual Defendants").

143.   Each of the Individual Defendants was a control person of ZLOOP by virtue of his position as a managing member, majority shareholder, director and/or officer of ZLOOP and during all times material to this action, the Individual Defendants did in fact exercise such control and were therefore "controlling persons" within the meaning of Section 20(a) of the Exchange Act.

144.   By reason of their majority ownership, management positions and directorships at ZLOOP, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised same to cause ZLOOP to engage in the conduct complained of herein.

145.   The Individual Defendants recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary to order to make the statements, in light of the circumstances under which they were made, not misleading to

MOSING. The purpose and effect of said false and misleading statements was, among other things, to induce MOSING to invest more and more money into ZLOOP.

146.    Each of the Individual Defendants was a culpable participant in the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged in Count 1(a) above, based on their willful and knowing participation in making the fraudulent misrepresentations, which have been described herein in great detail, to Kendall Mosing.

147.    MOSING has been damaged by the wrongful conduct of the Individual Defendants through their control of ZLOOP.

148.    The Individual Defendants exerted complete control over ZLOOP and were the agents of action for the acts complained of herein.  By reason of such conduct, the Individual Defendants are jointly and severally liable pursuant to Section 20 of the Exchange Act for all damages or losses suffered by MOSING.

## VI.    COUNT 2—VIOLATION OF LOUISIANA BLUE SKY LAWS: La. R.S. 51:701 *et seq.*

149.    The allegations of paragraphs 1-148 are hereby incorporated by reference.

150.    Under the Uniform Limited Offering Exception found at 10 La. Admin. Code § 703, a federal Form D, in the form required under 17 CFR 239.500, must be filed with the Louisiana Securities Commission for any transaction in which a Form D is required to be filed under federal Regulation D (17 CFR 230.503).   As referenced above federal Regulation D required the filing of a Form D in this matter, but defendants failed to file a Form D, thereby violating the Louisiana Blue Sky Laws at La. R.S. 51:701 *et seq*.  The ZLOOP DEFENDANTS also failed to consent to service of process in Louisiana as required by 10 La. Admin Code § 703(B)(3)(c).  The ZLOOP DEFENDANTS were represented by competent securities counsel

and therefore knew that the Form D filing was legally required, making their failure to do so willful.

151.    Under the Uniform Limited Offering Exception found at 10 La. Admin. Code § 703, the exemption claimed by the ZLOOP DEFENDANTS also fails due to their paying commission, fee or other remuneration to Jim Janes for soliciting funds from Kendall Mosing. Jim Janes was not registered as a dealer or salesman in Louisiana while he was utilized by ZLOOP.  Pursuant to the Louisiana Securities Law, La. R.S. §§51:703 and 51:712(A), securities dealers and salesmen are required to register.  Pursuant to the Louisiana Securities Law, La. R.S. §§51:703 and 51:712(A), it is unlawful for a securities dealer to utilize an unregistered salesman.

152.    The Louisiana Securities Law, La. R.S. 51:701 *et seq*., provides that it is unlawful for any person to offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission of material fact.

153.    Pursuant to the Louisiana Securities Law, it is also unlawful to offer to sell or to sell any security in violation of R.S. 51:703, 705, or any rule, regulation or order promulgated or issued by the commissioner under this Part. La. Rev. Stat. Ann. § 51:712.

154.    Pursuant to the Louisiana Securities Law, La. R.S. § 51:714, a person who violates La. R.S. § 51:712(A) is liable to the person buying such security and such buyer may sue for rescission damages, interest and attorneys' fees, all as more fully provided in that Section.

155.    MOSING is entitled to damages under Louisiana's Blue Sky Law, for the following reasons: (1) the ZLOOP DEFENDANTS made false and misleading statements of a material fact and failed to state material facts necessary in order to make the statements not misleading; (2) MOSING did not know of the untruth or omission; and (3) the ZLOOP

DEFENDANTS knew, or in the exercise of reasonable diligence, could have known, of the untruth or omission.

156.    As set forth in detail in Count I, The ZLOOP DEFENDANTS made false and misleading statements and concealed numerous material facts in connection with:

    a.   The sale of securities including investment contracts:

        i.   LLC Units;

        ii.   Corporate stock;

        iii.   Warrants;

        iv.   Subscription Agreements;

        v.   Grants;

        vi.   Franchise Buy-back Agreements;

        vii.   Louisiana and Texas Franchise Agreements;

    b.   The issuance of Private Placement Memorandums;

157.    Material facts misrepresented or concealed in connection with the above transactions are set forth throughout the Complaint include, but are not limited to the following:

    a.   That ZLOOP had a $100 million valuation;

    b.   That a UCC1 had been filed in North Carolina securing Kendall Mosing's capital contributions as represented in the Private Placement Memorandum issued by ZLOOP in March and April of 2013;

    c.   That the UCC1 that had allegedly been filed was an actual document, not a fabrication;

    d.   That an e-waste recycling center would imminently be built and operational in Opelousas, Louisiana;

e.   That Kendall Mosing would be on the Board of Directors;

f.   That Jim Janes would be on the Board of Directors;

g.   That ZLOOP's legal counsel was preparing all documentation requested by Kendall Mosing, and that Kendall Mosing would actually receive fully executed copies of documents he had signed, along with all other supporting documentation;

h.   That Kendall Mosing was purchasing equity through a Private Placement which never actually occurred, although Kendall Mosing's money was never refunded;

i.   That Kendall Mosing would receive a security interest in all property, plant and equipment and preemption rights in any future offerings pursuant to that Private Placement Memorandum;

j.   That actually receiving the equity bargained for would result in adverse tax consequences, manipulating Kendall Mosing into accepting worthless warrants instead;

k.   That, time and time again, through the use of high pressure sales tactics that are unfair and deceptive, Kendall Mosing must immediately invest additional money into ZLOOP, or else ZLOOP would close and Kendall would lose his entire investment;

l.   That ZLOOP was engaging a professional firm to raise capital, re-pay all amounts owed to Kendall Mosing, and buy back all franchises a firm that was in fact later terminated by ZLOOP;

m.  That the consistent backdating of documents was necessary to protect Kendall Mosing's financial interests;

n.  That Kendall Mosing would personally guarantee a line of credit, not pledge a checking account with the full amounts loaned to ZLOOP under the line of credit;

o.  That the UCC1 sent to Kendall Mosing as evidence of the perfection of his security interest was fabricated by BOSTON and/or LABARGE to deceive Kendall Mosing into believing that he was protected when he was not;

p.  That his investment funds would be spent on purposes other than those agreed to when investing, including but not limited to lavish shopping trips for the founder's wives in Chicago and expenditures on racing to help advance the racing care of BOSTON's son;

q.  That he was paying commissions to Jim Janes and his wife for Jim's assistance in securing investments from Kendall Mosing;

r.  That he would never be provided the evidence of his equity investments;

s.  That he would not receive fully executed versions of the contracts he signed;

t.  That the warrants Kendall Mosing received in exchange for his investment in the company were worthless and the LLC warrants were rendered invalid by the conversion;

u.  That it would be a substantial amount of time before any progress was made towards building the Opelousas, Louisiana e-waste recycling supercenter;

  v. That the ZLOOP DEFENDANTS refused to cooperate with Loeb Partners and refused to turn over any due diligence or take any reasonable action towards participating in capital fundraising;

  w. That the ZLOOP DEFENDANTS had no intention of actually raising capital to repay Kendall Mosing and repurchase the franchises, and in fact terminated Loeb Partners;

  x. That Kendall Mosing would lose equity in ZLOOP upon its conversion to a corporation; and

  y. That Kendall Mosing would have no governance rights at all or any mechanism in which to protect the $28 million invested in ZLOOP.

158. Having sold securities by means of misstatements or omissions of material fact, the ZLOOP DEFENDANTS are jointly and severally liable to MOSING for recessionary damages. La. R.S. 51:714 provides that, when a person has violated Section 712(A), the buyer of the security "may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security . . . less the amount of any income received thereto." The buyer is further entitled to (1) interest, (2) all taxable court costs, and (3) reasonable attorney's fees, upon the tender, where practicable, of the security at any time before the entry of judgment.

159. The ZLOOP DEFENDANTS' actions were intentional, so any negligence on the part of MOSING cannot be used to reduce MOSING's claims pursuant to Article 2323(C) of the Louisiana Civil Code.

160. No valid forum selection clause executed by the parties governs this claim.

## VII: COUNT 3—VIOLATION OF LOUISIANA BUSINESS OPPORTUNITY LAW: La. R.S. § 51:1821 *et seq.*

161.    The allegations of the foregoing paragraphs are hereby incorporated by reference.

162.    The Louisiana Business Opportunity Act, La. R.S. § 51:1821(1)(b) defines a business opportunity as "the sale or lease for an initial required consideration exceeding three hundred dollars of any goods or services which are transferred to a purchaser for the purpose of enabling the purchaser to start a business, and in which the seller or agent… [r]epresents that the seller, or any entity to which it will refer the purchaser, will purchase any or all products to be sold, made, produced, fabricated, assembled, grown, bred, or modified by the purchaser using in whole or in part the supplies, services, or goods sold to the purchaser by the seller; or [r]epresents that for a fee exceeding three hundred dollars the seller will provide a sales plan or marketing program which will enable the purchaser to derive income from the business opportunity which exceeds the price paid for the business opportunity."  As specifically alleged herein, the Louisiana and Texas franchises sold herein required the purchase of equipment directed by ZLOOP, required training and an OPERATIONS MANUAL by ZLOOP and required a marketing program conducted by ZLOOP.  ZLOOP agreed to purchase, through a lump sale as defined by Article 2458 of the Louisiana Civil Code, the eWaste accepted by ZLOOP at any supercenter and pay MOSING 60% of the proceeds.  The marketing program forced upon MOSING by ZLOOP, which primarily benefited BOSTON's son and was supposedly going to allow MOSING to make the profits promised him, cost MOSING well in excess of $300.  Thus, the ZLOOP DEFENDANTS were selling a business opportunity to MOSING.

163.    La. R.S. § 51:1823 prohibits business opportunity agents and sellers from: (1) representing that a business opportunity provides income or earning potential of any kind unless

76

the seller has documented data to substantiate the claims of income or earning potential and discloses this data to the prospective purchaser at the time such representations are made;… (7) including in any agreement a waiver of the purchaser's rights established by law…. (8) offering, selling, or leasing a business opportunity in Louisiana without appointing the secretary of state as its agent in Louisiana authorized to receive service of process.

164.    As specifically alleged herein, the ZLOOP DEFENDANTS misrepresented the income and earning potential of the Louisiana and Texas Zloop franchises to Kendall Mosing without any documented data to substantiate these claims.  The unbacked representations of business income include have been stated elsewhere in this Complaint but include, and are not limited to, the following:

   a.   BOSTON's email of five-year projections to Jim Janes on October 5, 2012, the day after Kendall Mosing and Sean Leblanc signed the franchise receipt document, that are totally arbitrary;

   b.   BOSTON's email itself contains multiple prohibited statements of unbacked projections, in addition to the attachment;

   c.   LABARGE's email to Jim Janes of a Louisiana prospectus on October 2, 2012 has inflated and unbacked revenue projections;

   d.   Franchise disclosure statements provided to Kendall Mosing included a table of contents for an operations manual purporting to be 426 pages long required to be part of the basis for financial projections, but said manual was never provided despite repeated requests for same; and

   e.   Kendall Mosing was initially provided eight Texas franchise books, but those books were taken back shortly after and never returned to Kendall Mosing.

165.    La. R.S. § 51:1823(2) precluded the ZLOOP DEFENDANTS from advertising a specific earning potential without setting forth a specific disclaimer: none of the Louisiana or Texas franchise documents contained the requisite disclaimer.

166.    La. R.S. § 51:1823(6) precluded the ZLOOP DEFENDANTS from failing to execute written agreements that include all material statements, representations and promises made orally before the written agreements were executed. Jim Janes repeatedly asked LABARGE about the Operations Manual referenced in the franchise disclosure paperwork and was told that the document was being prepared and not yet complete. To date, the Operations Handbook, allegedly 462 pages, has never been provided to Kendall Mosing, yet franchisees are contractually obligated to operate pursuant to this manual. Moreover, the ZLOOP DEFENDANTS have steadfastly refused to execute security agreements and file UCC1 financing statements as promised orally and in writing.

167.    As specifically alleged herein, the ZLOOP DEFENDANTS included a statement in the FRANCHISE AGREEMENT that Kendall Mosing was instructed to sign that included a waiver of all claims, known and unknown, against ZLOOP. The FRANCHISE AGREEMENT also seeks to exclude the Louisiana Business Opportunity Law from being applicable by stating North Carolina law applied. The FRANCHISE AGREEMENT also violates the Louisiana Business Opportunity Law by seeking to force any suit against the ZLOOP DEFENDANTS be filed in North Carolina instead of Louisiana, MOSING's choice of venue. The ZLOOP DEFENDANTS further included a waiver of all of Kendall Mosing's legal rights against ZLOOP in the March 27, 2014 franchise buy-back offering, and sought in various documents including the March 27, 2014 offering to have him waive his right to sue defendants in

Louisiana.  All such provisions, which conflict with La. R.S. § 51:1823(7) and 15 U.S.C.A. § 78cc(a), are invalid and unenforceable.

168.    ZLOOP further failed to appoint the secretary of state as its agent for service of process in Louisiana despite the fact that it sold business opportunities here.

169.    La. R.S. § 51:1822 required ZLOOP to maintain a $50,000 bond to cover its potential liability and BOSTON and LABARGE to each maintain a $25,000 bond to cover their potential liability.  The Louisiana Attorney General may, and should require a higher bond amount pursuant to 51:1822.    The ZLOOP DEFENDANTS failed to maintain the requisite bonds.

170.    A violation of the Louisiana Business Opportunity Act constitutes an unfair practice under the provisions of La-R.S. § 51:1401 through La-R.S. § 51:1418, as more fully discussed in the following count.

171.    The ZLOOP DEFENDANTS' actions were intentional, so any negligence on the part of MOSING cannot be used to reduce MOSING's claims pursuant to Article 2323(C) of the Louisiana Civil Code.

172.    No valid forum selection clause executed by the parties governs this claim.

**VIII: COUNT 4—VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICE LAW: La. R.S. § 51:1401**

173.    The allegations of the foregoing paragraphs are hereby incorporated by reference.

174.    La. R.S. § 51:1401 *et seq*. prohibits the use of unfair or deceptive acts or practices.

175.    The Louisiana legislature enacted the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 *et seq*. (the "Act") to prevent a person or legal entity from using unfair business practices against another person or legal entity.

176.   The Act provides for damages for actions by persons and corporations that are in violation of the Act.

177.   The Act declares unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  An act is not required to be both unfair and deceptive.

178.   Violation of a confidential and trusting relationship between two parties, where one uses that relationship to induce the other to invest in a company is an unfair or deceptive act or practice in the conduct of a trade or commerce, and is therefore unlawful under the terms of the Act.

179.   Conduct is considered unlawful, and a violation of the Act, when it involves:

fraud, misrepresentation, deception, breach of fiduciary duty, or other unethical conduct. *Core v. Martin*, 543 So. 2d 619 (La. App. 2 Cir. 1989); *Dufau v. Creole Engineering, Inc.*, 465 So. 2d 752 (La. App. 5 Cir. 1985), *writ denied*, 468 So. 2d 1207 (La. 1985).  A practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  *Dufau, supra*, citing *Coffey v. Peoples Mortgage & Loan of Shreveport, Inc.*, 408 So. 2d 1153 (La. App. 2 Cir. 1981).

*Wyatt v. PO2, Inc.*, 26,675 (La. App. 2 Cir. 3/1/95), 651 So. 2d 359, 361.   In business relationships, "basic business honesty" is required.  *See Nat'l Oil Serv. of La., Inc. v. Brown*, 381 So. 2d 1269, 1274 (La. App. 4 Cir. 1980).

180.   Defendants will be put on notice by the Louisiana Attorney General that they may be liable for treble damages and attorney's fees if their actions were declared to violate the Act. Failure to correct the unfair trade practice following receipt of this notice violates the Act and entitles plaintiff to recover treble damages and attorney's fees.  *McFadden v. Import One, Inc.*, Act.  2010-952 (La. Ct. App. 3 Cir. 2/9/11), 56 So. 3d 1212; *AIM Business Capital, LLC v. Reach Out Disposal, LLC*, 2014 WL 1401526 (W. D. La. 2014).

181.   The actions of the ZLOOP DEFENDANTS constitute unfair and/or deceptive practices, and are all parts of a bigger and ongoing scheme to defraud Kendall Mosing, in the following, non-exclusive ways:

a.   Utilizing Kendall Mosing's close friend, Jim Janes, as a commissioned (sometimes paid through his wife, Marian Janes) but unlicensed agent to secure investment from Kendall Mosing;

b.   Failing to disclose to Kendall Mosing that the ZLOOP DEFENDANTS were paying Jim Janes to secure investments from Kendall Mosing, referred to by Jim Janes as the "Bank of Louisiana;"

c.   Trying to force Kendall Mosing to waive his right to sue the ZLOOP DEFENDANTS in Louisiana in various documents through unlawful means;

d.   Misrepresenting to Kendall Mosing that the ZLOOP DEFENDANTS would locate a Super Center in Opelousas, LA;

e.   Providing Jim Janes with a prospectus for Zloop franchises on October 2, 2012 that contained unbacked and arbitrary revenue projections and failed to contain requisite disclosures required by law, including but not limited to the fact that the Louisiana Attorney General was one of the Louisiana agencies responsible for regulating franchises in Louisiana;

f.   Failing to maintain the surety bonds required by La. R.S. § 51:1822;

g.   Failing to ever provide the ZLOOP MANUAL as stated in and required by the FRANCHISE DISCLOSURE DOCUMENTS;

h.   Providing Jim Janes with unbacked and arbitrary financial representations regarding Zloop franchises, without requisite disclosures, on October 5, 2012;

i.  Having Kendall Mosing sign the Louisiana FRANCHISE AGREEMENTS, on or about October 15, 2012, less than 14 calendar days after he was provided the Louisiana FRANCHISE DISCLOSURE DOCUMENTS;

j.  Having Kendall Mosing sign documents in the FRANCHISE AGREEMENT purporting to waive any and all claims he had against the ZLOOP DEFENDANTS and his right to bring suit in Louisiana, in violation of La. R.S. § 51:1823(7) and 15 U.S.C.A. § 78cc(a);

k.  Backdating subscription documents and other paperwork to make it appear that the ZLOOP DEFENDANTS complied with state and federal disclosure requirements when that was not the case;

l.  Refusing to provide Kendall Mosing fully executed copies of documents that Kendall Mosing had signed;

m.  Making it appear that Jim Janes had actual authority in ZLOOP to make Kendall Mosing feel more secure in his investments, when in fact Jim Janes had no authority whatsoever and all such authority lay with BOSTON and LABARGE;

n.  Issuing Private Placement Memorandums that were incomplete and inaccurate due to, among other things, inclusion of unbacked financial forecasts without stating the assumptions supporting the forecasts and the other factual reasons set forth herein;

o.  Changing the operating agreement used in the PPM to which Kendall Mosing subscribed that would have given Kendall Mosing a majority interest in the

entity once converted from an LLC to a corporation in such a way that Kendall Mosing would no longer receive a majority interest at conversion;

p.  Stating that ZLOOP was valued at $80,000,000 or $100,000,000, and $300,000,000 when Mike Watson agreed to work there, before he quit a few months later after he was not being paid;

q.  Misrepresenting on March 7, 2013 that additional funding from sources other than Kendall Mosing should be complete in the next two weeks before Kendall Mosing had ever been provided any of the PPM materials;

r.  Failing to ever issue unit certificates to Kendall Mosing reflecting his 8.6% interest reflected on the March and April 2013 PPM documents;

s.  Contending that Kendall Mosing only owns 1% of the Zloop entities when their own PPM documents reflect his owning 8.6% in March and April of 2013;

t.  Stating that Jim Janes was on the board of directors when the only directors, the only persons with authority, were BOSTON and LABARGE;

u.  Refusing to issue stock of Zloop, Inc. to Kendall Mosing in the proportion his Capital Account compared to the total capital accounts of all ZLOOP members before the conversion;

v.  Knowingly and willfully failing to file a Form D when offering securities to Kendall Mosing in violation of state and federal law;

w.  Using high pressure sales tactics to encourage Kendall Mosing to make additional investments in ZLOOP;

x.  Misrepresenting that the PPMs would raise sufficient money to pay Kendall
Mosing back;

y.  Misrepresenting that Zloop will become the largest eWaste Recycler in the
world;

z.  Fabricating a UCC1 financing statement to send to Kendall Mosing and Jim
Janes to make them believe same had been filed to protect Kendall's
investment as per earlier agreements;

aa. Forwarding on July 26, 2013 an Operating Agreement to Jim Janes, for
Kendall Mosing, that was materially different from the one contained in the
March and April 2013 PPMs without any disclosure;

bb. Making oral promises of security for loans/investments to Kendall Mosing
and Jim Janes in August of 2013 consistent with the April 2013 PPM
provisions on security and later fabricating a UCC1 and forwarding same to
Kendall Mosing through interstate wires/email with the false statement that it
had been filed to make Kendall Mosing think he was secured;

cc. Making email representations to Jim Janes, through interstate wire, on
September 25, 2013 that UCC1 financing statement would be filed in North
Carolina to secure Kendall Mosing's investments and later fabricating a
UCC1 and forwarding same to Kendall Mosing through interstate wires,
email, with the false statement that it had been filed to make Kendall Mosing
think he was secured;

dd. Deceiving Kendall Mosing, through BOSTON, LABARGE and/or their
advisors, into taking warrants instead of the stock he purchased because the

arbitrary and totally false valuation applied by the ZLOOP DEFENDANTS created tax liability for Kendall Mosing if he took the stock he purchased;

ee. After deceiving Kendall Mosing into taking worthless ZLOOP warrants entitling him to purchase Class B units, the ZLOOP DEFENDANTS then proceeded to invalidate same by converting to a corporation with only Class A units;

ff. Telling Kendall Mosing that the line of credit they were contemplating him securing would cost him nothing and not require him to sue his own money when the opposite is what actually happened;

gg. Using the $5,000,000 line of credit for purposes other than those agreed to by Jim Janes and the ZLOOP DEFENDANTS;

hh. Emailing, using interstate wires, on December 5, 2013, the UCC1 financing statement that BOSTON and LABARGE fabricated and making the intentional and knowingly false statement that it had been filed with the North Carolina Secretary of State, all for the purpose of making Kendall Mosing think he was secured;

ii. Selling to Kendall Mosing without any disclosures whatsoever eight Texas franchises and then taking back the unsigned franchise agreements to modify same unilaterally after he had already agreed to pay $10,000,000 for same;

jj. Deceiving Kendall Mosing into signing, on March 19, 2014, a WRITTEN CONSENT OF STOCKHOLDERS OF ZLOOP, INC. TO ACTION WITHOUT MEETING without any disclosures regarding the consequences of the execution of this document;

kk. Issuing Kendall Mosing stock certificates for less than his actual ownership in ZLOOP.

ll. Deceiving Kendall Mosing to sign documents in the March 27, 2014 WRITTEN OFFER LETTER and attachments purporting to waive any and all claims he had against the ZLOOP DEFENDANTS and his right to bring suit in Louisiana and making the specific material factual misrepresentations and omissions of fact alleged herein, in violation of La. R.S. § 51:1821 *et seq.* and La. R.S. § 51:703 *et seq.*

mm.    Deceiving Kendall Mosing, on April 29, 2014, into accepting warrants in ZLOOP, which were worthless because of the false and arbitrary valuation contained therein, without any requisite disclosures as payment for effectively loaning ZLOOP another $9,000,000;

nn. Executing, on April 29, 2014, a loan agreement with Patriot Bank in the name of ZLOOP when the ZLOOP DEFENDANTS knew said entity no longer existed, and then after being told by the company's counsel that this would not be Zloop's problem if the entire line were borrowed, proceeding to entirely draw down the entire remaining $9,000,000 line of credit at Patriot Bank;

oo. Failing to ever provide Kendall Mosing copies of the minute book for ZLOOP despite the fact that he was responsible for 98% of the capital invested in this company; and

pp. When confronted with the fake UCC1 by Jim Janes on June 23, 2014, BOSTON cursed out Jim Janes and threatened to sue him;

qq. On August 5, 2014, the ZLOOP DEFENDANTS refused to file a valid UCC1, allow MOSING to visit their North Carolina facility and continued to refuse to provide MOSING with the fully executed documents discussed herein.

182.    The Act states that claims are "prescribed by one year running from the time of the transaction or act which gave rise to this right of action."  La. R.S. § 51:1409(E).  In *Fox v. Dupree,* 633 So.2d 612 (La. 1st Cir. 1993), the First Circuit held that the limitations period of La. R.S. § 1409(E) could not begin to run until the offending party complied with the law, and that every day that party was in violation gave rise to a new right of action for unfair trade practice. Likewise, in *Benton, Benton & Benton v. La. Public Facilities Authority,* 95-1367 (La. App. 1 Cir. 4/4/96), 672 So.2d 720, *writ denied,* 96-1445 (La. 9/13/96), 679 So. 2d 110, the First Circuit held that the Act's time deadlines could not begin to run as long as violations of the Act continue.  The ZLOOP DEFENDANTS' violations of the Act continue to this day.

183.    The ZLOOP DEFENDANTS' actions also constitute continuing torts under Louisiana law.  When the defendant's damaging conduct is of a continuing nature, prescription will not begin to accrue until the day of the last harmful act.[11]  If the operating cause of injury is tortious and continually gives rise to successive damages, prescription begins to run from the cessation of the particular wrongful conduct causing the damage.[12]

184.    Thereafter, through counsel on August 5, 2014, the ZLOOP DEFENDANTS refused to file a valid UCC1, allow MOSING to visit their North Carolina facility and continued to refuse to provide MOSING with the fully executed documents discussed herein.

---

[11] *South Central Bell Telephone Co. v. Texaco, Inc.*, 418 So.2d 531 (La. 1982).
[12] *Crump v. Sabine River Auth.*, 98-2326 (La. 6/29/99), 737 So.2d 720, 728.

185.    As a result of the ZLOOP DEFENDANTS' ongoing unfair, fraudulent, and deceptive acts in violation of the Act, MOSING has suffered damages in an amount to be determined at the trial of this matter.

186.    The ZLOOP DEFENDANTS' actions offend public policy and are unethical, oppressive and unscrupulous and violate the Act, entitling MOSING to treble damages and attorney's fees in addition to actual damages.  At MOSING's request, the Louisiana Attorney General shall put the ZLOOP DEFENDANTS on notice that if their actions are declared to be a violation of the Act, MOSING will be entitled to recover three times the amount of damages sought herein and attorney's fees.

187.    The ZLOOP DEFENDANTS' actions were intentional, so any negligence on the part of MOSING cannot be used to reduce MOSING's claims pursuant to Article 2323(C) of the Louisiana Civil Code.

188.    No valid forum selection clause executed by the parties governs this claim.

## IX: COUNT 5—FRAUD: ARTICLE 1953 OF THE LOUISIANA CIVIL CODE

189.    The allegations of the foregoing paragraphs are hereby incorporated by reference.

190.    Under Louisiana law, fraud is defined as a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. Anyone who conspires with another to commit fraud is solidarily liable with that person for the damage caused by the fraud.

191.    MOSING has specifically alleged in this Complaint numerous acts of fraud and conspiracy to commit fraud committed by the ZLOOP DEFENDANTS, which include but are not limited to:

a. Trying to force Kendall Mosing to waive his right to sue the ZLOOP DEFENDANTS in Louisiana in various documents through unlawful means;

b. Misrepresenting to Kendall Mosing that the ZLOOP DEFENDANTS would locate a supercenter in Opelousas, LA;

c. Providing Jim Janes with a prospectus for Zloop franchises on October 2, 2012 that contained unbacked and arbitrary revenue projections and failed to contain requisite disclosures required by law, including but not limited to the fact that the Louisiana Department of Justice was one of the Louisiana agencies responsible for regulating franchises in Louisiana;

d. Failing to ever provide the ZLOOP MANUAL as stated in and required by the FRANCHISE DISCLOSURE DOCUMENTS and disclosing that it had never even been completed;

e. Providing Jim Janes with unbacked and arbitrary financial representations regarding Zloop franchises, without requisite disclosures, on October 5, 2012;

f. Having Kendall Mosing sign documents in the FRANCHISE AGREEMENT purporting to waive any and all claims he had against the ZLOOP DEFENDANTS and his right to bring suit in Louisiana, in violation of La. R.S. § 51:1823(7) and 15 U.S.C.A. § 78cc(a);

g. Backdating subscription documents and other paperwork to make it appear that the ZLOOP DEFENDANTS complied with state and federal disclosure requirements when that was not the case;

h.  Refusing to provide Kendall Mosing fully executed copies of documents that Kendall Mosing had signed to hinder Kendall Mosing's ability to enforce any contracts;

i.  Making it appear that Jim Janes had actual authority in ZLOOP, to make Kendall Mosing feel more secure in his investments, when in fact Jim Janes had no authority whatsoever and all such authority lay with BOSTON and LABARGE;

j.  Issuing Private Placement Memorandums that were incomplete and inaccurate due to, among other things, inclusion of unbacked financial forecasts without stating the assumptions supporting the forecasts and the other factual reasons set forth herein;

k.  Stating that ZLOOP was valued at $80,000,000 or $100,000,000, and $300,000,000 when Mike Watson agreed to work there, before he quit a few months later after he was not being paid;

l.  Misrepresenting on March 7, 2013 that additional funding from sources other than Kendall Mosing should be complete in the next two weeks before Kendall Mosing had ever been provided any of the PPM materials;

m. Failing to ever issue unit certificates to Kendall Mosing reflecting his 8.6% interest reflected on the March and April 2013 PPM documents;

n.  Contending that Kendall Mosing only owns 1% of the Zloop entities when their own PPM documents reflect his owning 8.6% in March and April of 2013;

o.  Stating that Jim Janes was on the board of directors when the only directors, the only persons with authority, were BOSTON and LABARGE;

p.  Refusing to issue stock of ZLOOP to Kendall Mosing in the proportion his Capital Account compared to the total capital accounts of all Zloop, LLC members before the conversion;

q.  Knowingly and willfully failing to file a Form D when offering securities to Kendall Mosing in violation of state and federal law;

r.  Using high pressure sales tactics to encourage Kendall Mosing to make additional investments in ZLOOP;

s.  Misrepresenting that the PPMs would raise sufficient money to pay Kendall Mosing back;

t.  Misrepresenting that Zloop will become the largest eWaste Recycler in the world;

u.  Fabricating a UCC1 financing statement to send to Kendall Mosing and Jim Janes to make them believe same had been filed to protect Kendall Mosing's investment as per earlier agreements;

v.  Forwarding on July 26, 2013 an Operating Agreement to Jim Janes, for Kendall Mosing, that was materially different from the one contained in the March and April 2013 PPMs without any disclosure;

w.  Making oral promises of security for loans/investments to Kendall Mosing and Jim Janes in August of 2013 consistent with the April 2013 PPM provisions on security and later fabricating a UCC1 and forwarding same to

Kendall Mosing through interstate wires, email, with the false statement that it had been filed to make Kendall Mosing think he was secured;

x.  Making email representations to Jim Janes, through interstate wire, on September 25, 2013 that UCC1 financing statement would be filed in North Carolina to secure Kendall Mosing's investments and later fabricating a UCC1 and forwarding same to Kendall Mosing through interstate wires/email with the false statement that it had been filed to make Kendall Mosing think he was secured;

y.  Deceiving Kendall Mosing, through BOSTON, LABARGE and/or their advisors, into taking warrants instead of the stock he purchased because the arbitrary and totally false valuation applied by the ZLOOP DEFENDANTS created tax liability for Kendall Mosing if he took the stock he purchased;

z.  After deceiving Kendall Mosing into taking worthless ZLOOP warrants entitling him to purchase Class B units, the ZLOOP DEFENDANTS then proceeded to invalidate same by converting to a corporation with no Class B shares;

aa. Telling Kendall Mosing that the line of credit they were seeking would cost him nothing to guarantee and not require him to use his own money when the opposite is what actually happened;

bb. Using the $5,000,000 line of credit, that was later increased to $14,000,000, for purposes other than those agreed to by Jim Janes and the ZLOOP DEFENDANTS;

cc. Emailing, using interstate wires, on December 5, 2013, the UCC1 financing statement that BOSTON and LABARGE fabricated and making the intentional and knowingly false statement that it had been filed with the North Carolina Secretary of State, all for the purpose of making Kendall Mosing think he was secured;

dd. Selling to Kendall Mosing without any disclosures whatsoever eight Texas franchises and then taking back the unexecuted franchise agreements to modify same unilaterally after he had already agreed to pay $10,000,000 for same and never providing requisite disclosures or documentation regarding these franchises;

ee. Deceiving Kendall Mosing into signing, on March 19, 2014, a WRITTEN CONSENT OF STOCKHOLDERS OF ZLOOP, INC. TO ACTION WITHOUT MEETING without any disclosures regarding the consequences of the execution of this document;

ff. Issuing Kendall Mosing stock certificates for less than his actual ownership in ZLOOP;

gg. Deceiving Kendall Mosing to sign documents in the March 27, 2014 WRITTEN OFFER LETTER and attachments purporting to waive any and all claims he had against the ZLOOP DEFENDANTS and his right to bring suit in Louisiana and making the specific material factual misrepresentations and omissions of fact alleged herein, in violation of La. R.S. § 51:1821 *et seq*., La. R.S. § 51:703 *et seq.* and 15 U.S.C.A. § 78cc(a);

hh. Deceiving Kendall Mosing, on April 29, 2014, into accepting warrants in ZLOOP, which were worthless because of the false and arbitrary valuation contained therein, without any requisite disclosures as payment for effectively loaning ZLOOP another $9,000,000; and

ii. Executing, on April 29, 2014, a loan agreement with Patriot Bank in the name of ZLOOP when the ZLOOP DEFENDANTS knew said entity no longer existed, and then after being told by the company's counsel that this would not be Zloop's problem if the entire line were borrowed, then proceeding to entirely draw down the entire remaining $9,000,000 line of credit at Patriot Bank.

192.     MOSING has been damaged by the foregoing intentional actions of the ZLOOP DEFENDANTS and is entitled to all damages allowed under La C.C. art. 1958, including rescission and attorneys' fees.  The ZLOOP DEFENDANTS' actions were intentional, so any negligence on the part of MOSING cannot be used to reduce MOSING's claims pursuant to Article 2323(C) of the Louisiana Civil Code.

193.     No valid forum selection clauses executed by the parties governs this claim.

## X: COUNT 6—CONVERSION: ARTICLE 2315 OF THE LOUISIANA CIVIL CODE

194.     The allegations of the foregoing paragraphs are hereby incorporated by reference.

195.     The tort of conversion is an intentional act done in derogation of the plaintiff's possessory rights. *Kinchen v. Louie Dabdoub Sell Cars, Inc.*, 912 So.2d 715 (La. App. 5th Cir. 2005).

196.     The tort of conversion is committed when one wrongfully does any act of dominion over the property of another in denial of or inconsistent with the owner's rights.  *F.G.*

*Bruschweiler (Antiques) Ltd. v. GBA Great British Antiques, L.L.C.* 860 So. 2d 644 (La. App. 5th Cir. 2003).

197.    A conversion is committed when any of the following occurs: (1) possession is acquired in an unauthorized manner; (2) the chattel is removed from one place to another with the intent to exercise control over it; (3) possession of the chattel is transferred without authority; (4) possession is withheld from the owner or possessor; (5) the chattel is altered or destroyed; (6) the chattel is used improperly; or (7) ownership is asserted over the chattel. *Jefferson v. Crowell*, 956 So. 2d 746 (La. App. 2nd Cir. 2007).

198.    The ZLOOP DEFENDANTS converted:

 a.    The equipment purchased by MOSING when the Louisiana and Texas franchises were purchased and never delivering same;

 b.    The OPERATION'S MANUAL purchased by MOSING when the Louisiana and Texas franchises were purchased and never delivering same;

 c.    Plaintiffs' equity ownership in ZLOOP by failing to tender accurate unit or stock certificates and by failing to issue Kendall Mosing shares in ZLOOP consistent with the capital accounts of the members of Zloop, LLC before conversion.

 d.    MOSING's contractual agreements with ZLOOP by failing to provide him fully executed copies of same after repeated requests;

 e.    MOSING's UCC1 when they fabricated same and misrepresented to him that they had filed same with the Secretary of State of North Carolina;

 f.    MOSING's investments or advances of money or security from immediately before Kendall Mosing's August 14, 2013 wire of $3,000,000 to the ZLOOP

DEFENDANTS[13] to the increase in the Patriot Bank line of credit to $14,000,000, totaling approximately $20.3 million;

199.    The ZLOOP DEFENDANTS' actions were intentional, so any negligence on the part of MOSING cannot be used to reduce plaintiffs' claims pursuant to Article 2323(C) of the Louisiana Civil Code.

200.    No valid forum selection clause executed by the parties governs this tort claim.

## XI: COUNT 7—BREACH OF CONTRACT: ARTICLE 1994 OF THE LOUISIANA CIVIL CODE

201.    The allegations of the foregoing paragraphs are hereby incorporated by reference.

202.    Under La. Civil Code art. 1994, an obligor is liable for the damages caused by his failure to perform a conventional obligation.  A failure to perform results from nonperformance, defective performance, or delay in performance.

203.    The ZLOOP DEFENDANTS have breached their contractual obligations owed to Kendall Mosing as follows:

   a.   Failure to comply with their oral contract with Kendall Mosing to prepare and file whatever necessary to create a perfected security interest covering Kendall Mosing's financial contributions to ZLOOP;

   b.   Failure to comply with their oral contract with Kendall Mosing to provide him with fully executed copies of all documents they signed;

   c.   Failure to comply with the agreed upon uses of the funds invested and loaned by Kendall Mosing in the  September 30, 2013 Term Sheet;

---

[13]   This advance was based upon oral assurances of security that were later corroborated orally and in writing through fraudulent misrepresentations by the ZLOOP DEFENDANTS.

> d. Failure to issue Kendall Mosing an additional 5% of equity in ZLOOP, to bring his total ownership up to 7%, as agreed to in the September 30, 2013 Term Sheet; and
>
> e. Failure to pay amounts due under the December 17, 2012 and August 14, 2013 promissory notes when due.

204. Both promissory notes contain valid forum selection clauses executed by the parties requiring litigation of any contractual disputes regarding these promissory notes in the state or federal courts in Lafayette, Louisiana. The Term Sheet contract executed by the parties does not contain a forum selection clause.

## XII: COUNT 8— DETRIMENTAL RELIANCE: ARTICLE 1967 OF THE LOUISIANA CIVIL CODE

205. The allegations of the foregoing paragraphs are hereby incorporated by reference.

206. Under La. Civil Code art. 1967, a party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.

207. MOSING relied on the ZLOOP DEFENDANTS' promises that MOSING would receive a perfected security interest in all of ZLOOP's assets, including but not limited to its property, plant and equipment to their detriment.

208. MOSING further relied on the ZLOOP DEFENDANTS' promises that they would receive fully executed documents evidencing the transactions between Zloop and Kendall Mosing and Kendall Mosing's ownership in ZLOOP to his detriment.

209. Kendall Mosing further relied on the ZLOOP DEFENDANTS' promise that he should incur expense and set up a Louisiana franchise location and start collecting ewaste before the corporate facility was operational because the corporate facility was about to be ready and

the ZLOOP DEFENDANTS wanted to have a large amount of ewaste to process immediately upon opening. Because the Opelousas, Louisiana Super Center never developed as promised, Zloop LA, LLC has incurred losses of $266,177.75 to date, which continue to accrue.

210. MOSING reasonably relied on these promises.

211. The ZLOOP DEFENDANTS broke these promises.

212. MOSING has been damaged by these broken promises.

213. No valid forum selection clause executed by the parties governs this claim.

## XIII: COUNT 9—NEGLIGENT MISREPRESENTATION: ARTICLES 2315 AND 2316 OF THE LOUISIANA CIVIL CODE

214. The allegations of the foregoing paragraphs are hereby incorporated by reference.

215. Negligent misrepresentation occurs when a legal duty of the defendant requires said defendant supply correct information to plaintiff, a breach of that duty and damage caused by the breach. *Kent v. Cobb*, 35,663 (La. App. 2nd Cir. 2002), 811 So. 2d 1206.

216. Federal and state securities law, as discussed herein, creates duties on the defendants to provide plaintiffs with correct information. Federal and state franchise laws create duties on the defendants to provide plaintiffs with correct information. Texas and Louisiana unfair trade practice laws create duties on the defendants to provide plaintiffs with correct information. The duties of good faith and fair dealing required by Louisiana, North Carolina, Delaware and Texas law also create a duty on the defendants to provide correct information to plaintiffs.

217. Duties can also be assumed. The ZLOOP DEFENDANTS assumed the duty to act as MOSING's investment advisors on multiple occasions including, but not limited to, when they recommended he take warrants instead of equity in ZLOOP to avoid adverse tax consequences and when BOSTON told Kendall Mosing on July 26, 2013 that he wanted to make

sure Kendall Mosing was represented properly when reviewing the operating agreement at issue. This duty assumption is especially appropriate in a situation like this, where there is a special relationship between Kendall Mosing and the ZLOOP DEFENDANTS (fiduciary). Once the ZLOOP DEFENDANTS assumed the duty to act as MOSING's investment advisors, they were obligated to act with ordinary care in their recommendations. The ZLOOP DEFENDANTS failed to disclose their conflict of interest, all material facts of the investments and their payments to unlicensed salesmen in addition to failing to warn about the risks of the investments created by the structures of same.

218.    As detailed above, the ZLOOP DEFENDANTS, in the course of their business, breached these duties when they supplied incorrect information to plaintiffs as follows:

    a.  How long it would take for ZLOOP to become an actual, operational business;

    b.  About the valuation of ZLOOP;

    c.  Kendall Mosing's future role in ZLOOP;

    d.  Regarding whether the documents he signed were in his best interest, including but not limited to operating agreements, buy back agreements and deposit account assignments;

    e.  Whether certain documents he signed would create tax liabilities such that the structure of the transaction should be changed before he signed the document, including but not limited to the Term Sheet contract he signed herein that ended up with Kendall Mosing taking warrants instead of equity on the advice of the ZLOOP DEFENDANTS;

    f.  The development of an Opelousas e-waste recycling center to support the Louisiana and Texas franchise territories purchased by Kendall Mosing;

g.  Self-dealing transactions regularly engaged in by the ZLOOP DEFENDANTS, including but not limited to lavish shopping trips for the founder's wives in Chicago and expenditures on racing to help advance the racing care of BOSTON's son;

h.  Regarding a perfected security interest securing Kendall Mosing's substantial investment in and loans to ZLOOP;

i.  Regarding documentation and fully executed copies evidencing the numerous transactions between Zloop and Kendall Mosing being prepared and would be provided to Kendall Mosing;

j.  Regarding professional management being brought in to perform the CEO, CFO, and COO roles;

k.  Regarding the ZLOOP DEFENDANTS pursuing several rounds of financing to increase capital and pay back all amounts owed to Kendall Mosing;

l.  Regarding Loeb securing funds such that all of Kendall Mosing's franchises would be repurchased by ZLOOP; and

m.  Regarding Kendall Mosing being issued the same percentage ownership in Zloop, Inc. as corresponded to the percentage amount his capital account compared to the capital accounts of all LLC owners before the conversion of the LLC.

219.  MOSING has been damaged by these breaches.

220.  No valid forum selection clause executed by the parties governs this claim.

## XIV—RESPONDEAT SUPERIOR

221.    Defendants Zloop, LLC and/or Zloop, Inc. are liable for the tortious acts of its employees including without limitation, LABARGE.  LABARGE was acting within the course and scope of his employment with ZLOOP and in furtherance of the business of those entities when he engaged in the wrongful conduct described herein, and all of LABARGE'S knowledge is attributable to ZLOOP.

222.    Defendants Zloop, LLC and/or Zloop, Inc. are liable for the tortious acts of its employees including without limitation, BOSTON.  BOSTON was acting within the course and scope of his employment with ZLOOP and in furtherance of the business of those entities when he engaged in the wrongful conduct described herein, and all of BOSTON's knowledge is attributable to ZLOOP.

## XV—ACTUAL DAMAGES

223.    MOSING's damages are the net amount transferred to, or for the benefit of, Defendants for franchise purchases, equity investments or loans—$26,489,179.00—plus an additional amount of $700,000.00 of interest owed on the two promissory notes at issue. MOSING also seeks compensation for their loss of use of these funds for legitimate investment purposes while the ZLOOP DEFENDANTS improperly held these funds.

## XVI—TREBLE DAMAGES

224.    The wrongful conduct set forth herein constitute unfair trade practices within the meaning of the Louisiana Unfair Trade Practices Act, entitling MOSING to recover three times their actual damages and attorney's fees.

## XVII—JURY DEMAND

225.    Plaintiffs demand a trial by jury.

## XVIII—RELIEF REQUESTED

WHEREFORE, the Plaintiffs Kendall Mosing and Zloop LA, LLC respectfully requests that Defendants Robert Boston, Robert LaBarge, Zloop, LLC and Zloop, Inc. be summoned to answer this Complaint, that the case be tried to a jury, and that upon final judgment, Plaintiffs recover their damages as alleged herein, including rescission of all offerings identified in Counts I, II and V, their actual damages, treble damages, attorney's fees, expenses of suit, court costs, pre-suit interest, pre-judgment interest and post judgment interest all at the highest rates allowed by law.    Additionally, Plaintiffs seek judicial recognition of their security interest in the Defendants' property as pled herein.    Defendants should also be banned from ever using Regulation D in the future for any future fund raising efforts under Rule 507.

AND FOR ALL GENERAL AND EQUITABLE RELIEF, ETC.

Respectfully submitted,

ALLEN & GOOCH
A Law Corporation

/s/ JAMES H. GIBSON
_____

JAMES H. GIBSON (#14285)
CHARLES M. KREAMER, SR. (#23171)
CLAY M. ALLEN (#2400)
DAVID J. AYO (#28868)
2000 Kaliste Saloom Road, Suite 400 (70508)
Post Office Drawer 81129
Lafayette, LA.  70598-1129
337-291-1300 – Direct Dial
337-291-1305 – Facsimile
E-Mail:  jimgibson@allengooch.com
COUNSEL FOR PETITIONERS,
Kendall G. Mosing and Zloop LA, LLC